[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 18-13995

_____

DAVID FREEMAN,

Petitioner-Appellant,

*versus*

COMMISSIONER, ALABAMA DEPARTMENT OF
CORRECTIONS,

Respondent-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Alabama
D.C. Docket No. 2:06-cv-00122-WKW-WC

_____

Before JILL PRYOR, GRANT, and LAGOA, Circuit Judges.

LAGOA, Circuit Judge:

David Freeman appeals the district court's order denying his petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. This Court issued a certificate of appealability ("COA") with respect to the following claim: "Whether trial counsel provided ineffective assistance of counsel in violation of the Sixth Amendment to the United States Constitution when at the penalty phase of trial, it failed to conduct a reasonable mitigation investigation and failed to uncover and present mitigation evidence." After careful review, and for the reasons stated below, we affirm.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

In 1996, Freeman was convicted of six counts of capital murder related to the murders of Sylvia Gordon ("Sylvia") and Mary Gordon ("Mary") and sentenced to death. *Freeman v. State*, 776 So. 2d 160 (Ala. Crim. App. 1999). The Alabama Court of Criminal Appeals set forth the relevant facts, adopted from the state trial court, as follows:

> On March 11, 1988, Deborah Gordon Hosford picked up her sister, [17-year-old] Sylvia Gordon, from Lanier High School [in Montgomery] and drove to their home at 29 Rosebud Court, arriving at approximately 3:30 p.m. Waiting on the porch was the defendant, David Freeman, who had ridden his bicycle to their home. Freeman . . . lived in a trailer near the Gordon

home, and he wanted a romantic relationship with Sylvia Gordon. Sylvia was not romantically interested in Freeman, and was planning to tell him that she no longer wished to see him. Deborah, Sylvia, and Freeman entered the home. Deborah had to return to work and left at approximately 3:45 p.m. When she left, Freeman and Sylvia were sitting on the couch.

Freeman had given Sylvia a note essentially stating that he did not like seeing her only once a week, that he loved her, and that he did not want to lose her like all of his other girlfriends. Sylvia in return gave Freeman a note stating that she viewed the relationship only as friendship and that she did not want to have a serious relationship. Approximately a week prior to the murders, Freeman had a conversation with Francis Boozer, a co-worker, and told her that he would rather see Sylvia dead than [for] someone else have her.

At about 1:00 a.m. Deborah Gordon Hosford returned home. She found the lights of the home turned off and the door unlocked and slightly ajar. She went inside and noticed that the house had been ransacked. She went to her sister's bedroom and found Sylvia, dead, in her bed with multiple stab wounds and clad only in a T-shirt and socks. As she was fleeing the house, she saw her mother, [43–year–old] Mary Gordon, lying in a pool of blood on the floor of her bedroom. Mrs. Gordon was clad only in

a shirt, with her body being nude from the waist down with her legs spread apart.

Police arrived at the Gordon home and found blood throughout most of the house. Mary Gordon was stabbed 14 times by Freeman; two wounds were fatal. She lived for about five minutes [after being stabbed the first time]. She had also been raped, and the semen deposited in her was consistent as having been left by Freeman. Sylvia Gordon was stabbed 22 times by him, and she remained conscious for eight to ten minutes after the first wound was inflicted. None of the wounds were fatal; Sylvia Gordon bled to death. Examination also revealed that Sylvia Gordon had tears in her vagina. Additionally, police found a shoe print on the shirt of Mary Gordon and a shoe print on a card found on the floor near the body of Mary Gordon. Police also noted that all [telephone] lines in the house had been cut.

Freeman had brought a knife with him and used it to brutally kill Sylvia Gordon because she did not want a relationship, as well as [to] kill Mary Gordon when she walked in on the murder. After committing the murders, Freeman stole the Gordons' 1980 Pontiac Sunbird and put his bike that he had ridden to the Gordon home in it and fled the scene. He attempted to establish an alibi by later going to work. The Gordons' car was found in a parking lot near Freeman's apartment. Freeman's fingerprint was found on the car and blood that was consistent with that of Sylvia Gordon and Mary Gordon was also in the car.

Additionally found in the car was a butcher knife that had been cleaned of blood. The butcher knife was examined by an expert in trace evidence with the Department of Forensic Sciences and was determined to be consistent with having caused the wounds to Mary Gordon, to cut the bra and panties of Mary Gordon, and to cut the jeans of Sylvia Gordon.

When the police arrived at Freeman's apartment, Freeman answered the door, and the officers noted a bandage on Freeman's right hand. When asked how he cut his hand, Freeman lied, claiming that he had cut his hand while repairing a chair. Freeman was arrested at his apartment. The police, upon a consent to search, found the clothing worn by Freeman, which had blood consistent with that of Sylvia Gordon on them. A mixture of blood and semen was found in the underwear that he had worn. His shoes were seized and compared to the prints found on the shirt of Mary Gordon and the card found in the Gordon home. Examination revealed that Freeman's shoes were consistent with the prints found at the scene. Bite marks were noted on Freeman's arm, which were [determined to have been] made by Sylvia Gordon.

Freeman initially lied to the police as to his involvement in the crimes. He tried to establish an alibi for his whereabouts. However, when confronted with the evidence, Freeman admitted to stabbing Sylvia Gordon and stated that upon Mary Gordon's entering the home he had no choice but to stab her. Freeman

> also claimed to have blacked out on two occasions
> during the crimes.

*Id.* at 169–70 (alterations in original); *see also Ex parte Freeman*, 776 So. 2d 203, 204–05 (Ala. 2000) (reiterating a condensed statement of the facts surrounding the murder and stating that "[t]he opinion of the Court of Criminal Appeals provides a thorough treatment of the facts of this case").

## A.  State Court Trial and Direct Appeal

In June 1988, Freeman was indicted on six counts of capital murder. *Ex parte Freeman*, 776 So. 2d at 203. Specifically, Count I of the indictment charged Freeman with murder where two or more persons are murdered by one act or pursuant to one scheme or course of conduct. *See* Ala. Code § 13A–5–40(a)(10). Counts II and III charged Freeman with murder during a burglary in the first degree. *See id.* § 13A–5–40(a)(4). Counts IV and V charged Freeman with murder during a robbery in the first degree. *See id.* § 13A–5–40(a)(2). Count VI of the indictment charged Freeman with murder during a rape in the first degree. *See id.* § 13A–5–40(a)(3).

The case proceeded to trial in the Fifteenth Judicial Circuit for Montgomery County, Alabama, on June 17, 1996. Freeman was represented by lead counsel Allen Howell ("Howell"), and

18-13995                Opinion of the Court                    7

attorneys William Abell ("Abell") and John David Norris ("Nor-
ris").[1]  At trial, Freeman "pleaded not guilty by reason of mental
disease or defect, and he argued to the jury that as a result of his
alleged mental disease or defect, he was unable to conform his con-
duct to the requirements of the law." *Freeman*, 776 So. 2d at 169.

During his opening statement, Freeman's counsel claimed
the evidence would show that Freeman suffered from borderline
personality disorder, and that the condition caused him to be

_____

[1] This was not the first time Freeman was tried on the charges and represented
by Howell.  Freeman was initially indicted on June 3, 1988, on the same six
charges and pleaded not guilty and not guilty by reason of mental disease or
defect. *Freeman v. State*, 651 So. 2d 573, 574 (Ala. Crim. App. 1992).  After a
trial at which he was represented by Howell, a jury found Freeman guilty as
charged and by an advisory verdict recommended that he be sentenced to
death. *Id.*  In accordance with the jury's recommendation, the trial court sen-
tenced Freeman to death.  *Id.*  However, on a subsequent direct appeal after
remand, the Alabama Court of Criminal Appeals reversed the convictions and
remanded for a new trial, finding a violation of *Batson v. Kentucky*, 476 U.S.
79 (1986), by the State. *Freeman v. State*, 651 So. 2d 576, 597 (Ala. Crim. App.
1994).

A second trial began in January 1996, but the trial court declared a mistrial due
to Howell being ill.  Freeman then moved to dismiss the indictment, arguing
that jeopardy had attached.  The trial court denied the motion on February 21,
1996.  Freeman then filed a petition for writ of mandamus, which the Alabama
Court of Criminal Appeals and the Supreme Court of Alabama both denied.
On February 23, 1996, Freeman filed an emergency petition for writ of habeas
corpus and motion to stay trial and petition for removal of the case in the Mid-
dle District of Alabama, seeking to remove his case to federal court, and for
the district court to determine that his double jeopardy protections had been
violated.  The district court denied those petitions on February 26, 1996.

unable to conform his conduct to the requirements of law. Freeman's counsel argued that the State of Alabama was responsible for the crimes, given Freeman's lifetime of placements in foster and state care, during which he was abused. He also argued that the evidence would show Freeman was diagnosed at age thirteen by Dr. Barry Burkhart, a clinical psychologist, as needing long-term psychiatric treatment but none was given, and that some of the psychologists employed by the State of Alabama did not do proper evaluations.

The State presented fifteen witnesses in its case in chief, including homicide detectives, the medical examiner, and Deborah Gordon Hosford, who was Mary's daughter and Sylvia's sister.

The defense began its case in chief by presenting the testimony of Marvin Hartley ("Hartley"). From 1986 to 1987, Hartley was a child-care worker at the Bell Road Group Home where Freeman lived. Hartley described Freeman as being a loner who was isolated from other children in the home and as "starving for love." He stated that Freeman would have occasional outbursts when he did not get his way and once punched a hole in a wall.

Dr. Burkhart then testified extensively for the defense. Dr. Burkhart evaluated Freeman as a teenager at the Lee County Youth Development Center and saw him on four occasions in 1989—twice in June and twice in August. He spent twelve hours with Freeman and administered numerous tests. His evaluation of Freeman was based on the test results, along with his history, the previous psychological evaluations performed on Freeman, and

observation. He reviewed the records concerning Freeman's history, which were admitted into evidence during his testimony. Specifically, he reviewed records from the following entities: the Children's Hospital of Alabama at Birmingham; the Eufaula Adolescent Center; the Taylor Hardin Hospital in Tuscaloosa; Mobile Clinical & Neuropsychological Associates; the Talladega County Department of Human Resources (the "Department"); the Rolla Regional Center for the Developmentally Disabled; the Eufaula Adolescent Center; the Lee County Youth Development Center; and Family and Child Services in Birmingham.

Dr. Burkhart testified as to an evaluation he performed on Freeman when Freeman was thirteen years old. He stated that Freeman was "a very difficult child to place, because of numerous previous failed placements." He characterized Freeman as a "very, very troubled child," who was depressed, angry, and had impulse control problems. Freeman was recommended to be placed in a long-term treatment facility and psychotherapy. Dr. Burkhart testified that Freeman was at the Rolla Development Disability Facility when he was seven because he had been removed from several placements, including a relative's home in Missouri. Freeman was removed from the home in Missouri because "there was evidence from [Freeman's] behavior that there was abuse in the home." He saw Freeman again in 1989 and diagnosed him with major depressive disorder and Schizotypal Personality Disorder, a condition characterized by a pervasive pattern of social discomfort and disability, an inability to get along with others, an inability to make any

attachment to people, and brief paranoid psychotic episodes. Dr. Burkhart was aware of a recent diagnosis by Dr. Guy Renfro that Freeman had borderline personality disorder, and he did not disagree with the diagnosis.

During his testimony about the diagnostic criteria for borderline personality disorder, Dr. Burkhart described the circumstances of Freeman's childhood. Freeman had never known his mother during his "verbal lifetime," and she was "mentally retarded and mentally ill and incapable of taking care of any of her children." Dr. Burkhart mentioned several times that Freeman had spent his childhood in multiple placements—of which he counted eighteen by the time Freeman was nine years old—and that his childhood was "replete with failure of attachment." Dr. Burkhart testified to an incident when Freeman was a child, where he believed that a woman he saw in church was his mother. Dr. Burkhart described Freeman's behavior as it related to a diagnosis of borderline personality disorder, explaining that "[b]eginning at about age seven, every placement at which [Freeman] has been reports that he could not control his anger, that he had temper outbursts, that he had tantrums, that he made threats to people, that he got in fights." Based on his evaluation of Freeman, Dr. Burkhart believed it was "very likely" that, at the time of his capital offenses, Freeman suffered a "brief reactive psychosis" from the stress of being abandoned or rejected by Sylvia, which rendering him unable to conform his conduct to the requirements of the law.

The State cross-examined Dr. Burkhart with the psychological evaluations conducted on Freeman throughout his life and after he committed the murders. None of the mental health professionals had diagnosed Freeman as psychotic or found that he lacked the ability to conform his conduct to the law. During Burkhart's cross-examination, the State admitted numerous exhibits, comprised of treatment summaries, placement reports, and psychological evaluations, all of which—with the apparent exception of a report by Dr. Renfro—came from exhibits already in evidence. Dr. Burkhart was also asked to confirm descriptions of Freeman's aggressive and poor behavior contained in the exhibits.

The final witness for the defense's case in chief was Yvonne Price Copeland, a social worker for the Talladega County Department of Human Resources in charge of Freeman's case while he was in foster care. Copeland testified that Freeman was placed in foster care shortly after he was born and never had a relationship with his mother, who, according to her records, was "mentally retarded." Freeman's father was also unable to care for him, as he was elderly, disabled, and had health problems himself. Copeland chronicled Freeman's placements in foster homes and group homes beginning at the age of eight months. Copeland testified that among the placements was one with his stepmother's daughter in Missouri, but that placement failed due to allegations of abuse, and because Freeman was reported as being defiant and aggressive. Other foster placements failed because of Freeman's behavior. Copeland testified that, after the unsuccessful foster

placements, Freeman spent five years at St. Mary's group home in Mobile, Alabama. He seemed to do well at St. Mary's until 1983, when the staff reported he was aggressive and assaulted a house parent. Freeman would not discuss with Copeland what occurred at St. Mary's. After being sent to two crisis shelters in Mobile, Alabama, Freeman was sent to the Lee County Youth Development Center for evaluation. Freeman was then sent to the Coosa Valley Attention Facility, a shelter facility, for two months before being sent to Gateway, a treatment facility for adolescent children. While Freeman was at Gateway, Copeland stopped working on his case in 1983. She reviewed the remainder of the Department's records in preparation for her testimony the trial. She testified that, in addition to the two times that he tried to run away while she was his case supervisor, Freeman also attempted to run away from Gateway, and had climbed to the top of a building and would not get down. He also self-mutilated with a butcher's knife.

Copeland confirmed that a defense exhibit was a social summary written by Doris Reeder, the social worker who was assigned Freeman's case after Copeland, and included a chronological summary of Freeman's placements. Her recollection was that there were between fourteen to sixteen attempts to place Freeman in facilities that refused to accept him, mostly because they could not give Freeman the services he needed, e.g., because he was delayed socially. Copeland also testified that Freeman's siblings had all been taken into custody by the Department at one point or

another.   Finally, she testified that Freeman "was probably the most difficult child that I had in my caseload."

The State cross-examined Copeland with Reeder's social summary.  Copeland testified as to the mental limitations of Freeman's mother, which Copeland witnessed herself when she was sent to the home to investigate a report about the mother's care of Freeman's brother.  Copeland testified regarding Freeman's multiple placements as an infant.  She also testified that Freeman, along with his brother Jimmy Terry and sister Linda, were sent to live with his stepmother's daughter in Missouri (the "Smiths").  There were allegations of abuse made by neighbors against the Smiths, but an investigation concluded that "no real abuse had in likelihood occurred."  After that, Freeman was sent to the Rolla Center for evaluation at age seven, and then returned to Alabama.  Freeman was then with another foster family for six months, who could not cope with his behavior.  Freeman was then sent to the Symmetry House, which was a treatment center for young children.  Freeman had behavior problems at Symmetry House as well.  Copeland testified that an intake form from October 19, 1977, stated that Freeman "will do whatever necessary to get his way."  A foster family with whom Freeman lived after Symmetry house kept Freeman for only a month because he was aggressive and hostile toward their young child.

Freeman then lived at St. Mary's Home from 1978 to 1982. There, he was defiant and ultimately struck a child-care worker. Copeland continued to chronicle Freeman's placements after St.

Mary's, including stays at emergency shelters, Lee County Development Center, and then at Gateway. Copeland read from a written summary addressing Freeman's behavior at Gateway that included statements that Freeman was more aggressive with female staff than with male staff. The State continued to cross-examine Copeland concerning Freeman's behavior while at Gateway, which included stealing, lying, and fighting. Freeman was moved from Gateway in August 1984 after an incident and placed at Eufaula Adolescent Adjustment Center. Copeland acknowledged that Eufaula attempted to give Freeman a multi-disciplinary treatment that included group and individual therapy and recreation, but when confronted with his inappropriate behavior, he would not accept responsibility. After Freeman "[e]loped" from Eufaula with a girl, he was charged with burglary for breaking into a trailer and was sent to the Department of Youth Services. Copeland's cross-examination concluded with her acknowledgment that Freeman's "behavior problems were what mainly limited us in the selection of a facility" for placement.

In rebuttal, the State presented the testimony of Dr. Renfro by videotaped deposition[2] and introduced a report by him into evidence. Dr. Renfro was appointed by the trial court to assess Freeman's competency to stand trial and his mental state at the time of the murders. Based upon his four meetings with Freeman in 1995,

---

[2] Freeman objected to the playing of Dr. Renfro's videotaped deposition because he "had withdrawn the questions, direct and re-direct, on the deposition." The trial court overruled the objection.

a review of previous tests performed on Freeman, and his history, Dr. Renfro concluded that Freeman displayed Borderline Personality Disorder. Dr. Renfro described the various features of a Borderline Personality Disorder to include instability of self-image and interpersonal relationships, and testified that the frequent change in Freeman's caregivers could have contributed to the instability of Freeman's behavior in his numerous placements. Dr. Renfro agreed that being removed from the home of a proposed adoptive family in Missouri—the Smiths—could have contributed to Freeman's "[v]ery fragile sense of self-image" and that "perhaps that could set a tone for feeling abandoned or feeling rejected because he had been moved from place to place and shifted from institution to institution and home to home." Freeman was very reluctant to talk about his "family of origin" with him. Dr. Renfro testified that Freeman has fears of being abandoned and at times displayed inappropriate anger. He opined that Freeman experienced rage and anger upon being rejected, but it was not necessarily uncontrollable. Finally, Dr. Renfro testified on cross-examination that he considered Freeman's statement to the police concerning stabbing Mary and cutting the phone wire as indicating that Freeman had the ability to make choices.

The final witness was Dr. Joe Dixon, a forensic psychologist in charge of coordinating the Lunacy Commission Evaluation when Freeman was in the Taylor Hardin Secure Medical Facility in Tuscaloosa, Alabama. Dr. Dixon's notes from his initial psychological contact form completed in December 1988 indicated that

Freeman did not want to talk about where he was raised or his personal history. The Lunacy Commission that performed the evaluation on Freeman was comprised of three forensic psychiatrists. Dr. Dixon testified regarding the findings made by each psychiatrist as set forth in the Lunacy Commission Summary Report in January 1989. In describing the day of the murders to each psychiatrist, Freeman recounted his day without mentioning the murders. None of the psychiatrists found that, at the time of the murders, Freeman lacked capacity to conform his conduct to the law as a result of mental disease or defect.

Ultimately, the jury found Freeman guilty on all six counts of capital murder. The case then proceeded to the penalty phase.

At the penalty phase, the State presented no witnesses but presented all of the previously introduced testimony and exhibits. Freeman submitted the following mitigating circumstances: that he had no significant history of prior criminal activity; that he was under the influence of an extreme mental or emotional disturbance at the time of the offense; that he was under extreme duress at the time of the offense; that he was unable to conform his conduct to the requirements of the law at the time of the offense; that he was substantially impaired; and his age of eighteen. Freeman also offered all the testimony and exhibits he put forth during the guilt phase.

Freeman offered one witness during the penalty phase, Alexander Moore, who worked at St. Mary's House when Freeman lived there. Moore described Freeman as "more or less a loner

during his stay at St. Mary's, rather on the quiet side until confronted with anything that needed to be done or any corrections that needed to be made." He confirmed that he had given an investigator for the defense two photographs of Freeman from the time he was at St. Mary's, and the photos were admitted into evidence. Finally, Moore testified that "[Freeman], to my way of thinking, was a good child like any other normal child that lived the lifestyle that he had to live. I think he would be deserving of some leniency, . . . if at all possible."

Freeman's counsel's closing argument at the penalty phase consists of three-and-a-half transcript pages. His counsel first argued that the State mischaracterized a prior incident in which Freeman had used a knife, and that Freeman's prior juvenile record was not admissible for anything other than as "part of the total picture necessary to see this boy and his total mental state." Counsel then argued that the mitigators of "extreme mental or emotional disturbance and the inability to conform his conduct to the requirements of law . . . aren't the same here. They don't mean the same thing as they did back [t]here," apparently referencing the insanity defense from the guilt phase, i.e., that Freeman was unable to conform his conduct to the requirements of the law as a result of his alleged mental disease or defect. Counsel argued that the jury could "still find that these factors exist, because, obviously, they do. You [the jury] can decide they don't exist to the level necessary to not hold him responsible, but they exist, and they exist to the level, we submit, that he shouldn't be put to death." Counsel argued that

Freeman's age at the time of murders should be considered as well as the mitigator of "duress" because "he had a lot going on inside of him that made all of this occur." Counsel argued for leniency, as Moore as suggested.

The jury ultimately returned an advisory verdict recommending a sentence of death for the murders of Sylvia and Mary by a vote of eleven to one.[3] On August 15, 1996, the trial court entered a sentencing order specifically identifying aggravating and mitigating circumstances and imposed a sentence of death. The trial court found as aggravating circumstances that the capital offense was committed while Freeman was engaged in the commission of, or an attempt to commit, burglary, robbery, and rape, and that the murders were especially heinous, atrocious, or cruel. As statutory mitigating circumstances, the trial court found that Freeman had no significant history of criminal activity, that the offense was committed while Freeman was under the influence of extreme mental or emotional disturbance, and that Freeman was eighteen at the time of the crime. In considering all other relevant mitigating circumstances offered, the trial court found that Freeman's emotional disturbance due to his family history and multiple placements was a mitigating circumstance as well as Freeman's antisocial personality.

---

[3] In 1996, Alabama juries rendered advisory verdicts and trial courts determined sentences. *See* Ala. Code §§ 13A-5-46, 13A-5-47 (1996).

Freeman's convictions and sentence of death were affirmed by the Alabama Court of Criminal Appeals. *Freeman*, 776 So. 2d at 203. The Alabama Supreme Court granted Freeman's petition for certiorari review, and, after oral argument and review of the record, affirmed the judgment of the Court of Criminal Appeals. *Ex parte Freeman*, 776 So. 2d at 204–05. On October 30, 2000, the United States Supreme Court denied Freeman's petition for writ of certiorari. *Freeman v. Alabama*, 531 U.S. 966 (2000).

## B. State Court Postconviction Proceedings

On September 28, 2001, Freeman filed a petition for relief from his convictions and sentence pursuant to Alabama Rule of Criminal Procedure 32. Freeman filed several amendments, culminating in his Fourth Amended Petition for Relief from Conviction and Sentence Pursuant to Rule 32 of the Alabama Rules of Criminal Procedure (the "Rule 32 petition"). As Ground II for relief, Freeman alleged that he was denied the effective assistance of trial counsel in violation of the Sixth and Fourteenth Amendments.[4]

---

[4] Freeman raised twelve grounds for relief, which the district court summarized below, as:

> (1) his June 1996 retrial following the January 1996 mistrial violated Double Jeopardy principles, (2) his trial counsel rendered ineffective assistance[,] . . . (3) the admission of graphic and cumulative photographic and videotaped evidence violated Petitioner's right to a fair trial, (4) the admission of unreliable and unscientific testimony by a forensic odontologist regarding bite marks violated Petitioner's right to a fair trial, (5)

Under Ground II, Freeman alleged seventeen instances of ineffective assistance of counsel, labeled "A" through "Q."[5]  Relevant to

---

the admission of the hearsay testimony of Dr. Joel Dixon violated Petitioner's rights under the Confrontation Clause, (6) Petitioner's rights under the Eighth Amendment were violated[,] . . . (7) Petitioner's right to counsel was violated when his lead trial counsel suffered from a debilitating psychological condition throughout trial, (8) his appellate counsel rendered ineffective assistance[,] . . . (9) Petitioner's lead trial counsel suffered from an actual conflict of interest arising from a debilitating psychological condition which said counsel suffered throughout trial which said counsel failed to reveal to Petitioner, (10) Petitioner's rights under the holdings in *Ring* and *Apprendi* were violated, (11) Petitioner is mentally retarded and, under *Atkins v. Virginia*, constitutionally ineligible for the death penalty, and (12) Petitioner's indictment was constitutionally deficient under *Ring* and *Apprendi* and under Alabama law.

[5] The seventeen alleged instances of ineffective assistance of counsel as set forth in Ground II were summarized by the district court as follows:

(a) failing to conduct meaningful voir dire, (b) failing to object to the admission of graphic and cumulative photographic and videotape evidence showing the crime scene and the victims, (c) failing to object to the testimony and narration of the crime scene video by the evidence technician, (d) failing to object to the admission of the forensic odontologist's testimony as unreliable and unfounded scientifically, (e) failing to present evidence showing an alternative source for the bite marks on Petitioner's arms, (f) failing to submit autopsy data to an independent pathologist for evaluation, (g) failing to present evidence showing Petitioner suffered from unspecified neurological impairments, (h) deposing Dr. Guy Renfro, (i) failing to

18-13995                  Opinion of the Court                      21

this appeal are Freeman's allegations "J" and "K," which stated as follows:

> J. Trial counsel failed to investigate, develop and present available evidence in mitigation of petitioner's punishment. But for counsel's deficient performance, there exists a reasonable probability that the result of petitioner's trial would have been different.
>
> K. Trial counsel failed to present available evidence regarding petitioner's background and his mental health history to the jury in a manner which would have allowed the jury to give this evidence mitigating effect during the sentencing phase. But for counsel's deficient performance, there exists a reasonable

---

object on hearsay grounds to the testimony of Dr. Joel Dixon summarizing the findings of other mental health professionals who actually examined Petitioner, (j) failing to present unidentified mitigating evidence, (k) failing to present unidentified evidence of Petitioner's background and mental health history in a manner that would have allowed the jury to give mitigating effect to such evidence, (l) failing to present evidence of Petitioner's good behavior in prison, (m) failing to impeach the testimony of prosecution witness Frances Boozer, (n) failing to raise challenges to the Alabama capital sentencing statute based upon the Supreme Court's holdings in *Ring v. Arizona* and *Apprendi v. New Jersey*, (o) conceding during closing argument at the guilt-innocence phase of trial that a guilty verdict determined the appropriate sentence, (p) failing to object to the admission of raw psychological testing data, and (q) failing to investigate and present evidence showing Petitioner is mentally retarded . . . .

probability that the result of petitioner's trial would
have been different.

The postconviction court held an evidentiary hearing on
Freeman's Rule 32 petition on June 4, 2003.  Three of Freeman's
attorneys testified: (1) Abell, the backup lead attorney in Freeman's
trial; (2) Norris, the second chair counsel at Freeman's trial; and
(3) Thomas Goggans, the appellate counsel in Freeman's direct ap-
peal.

Abell testified that he was appointed to represent Freeman
about three weeks before his trial as a backup lead attorney because
there had been several continuances due to Freeman's lead coun-
sel, Howell, being ill.  By the time of Abell's appointment, Howell
had hired the experts and the investigations had been done.  Abell's
role was to look over the records, and he met with Freeman once.
Howell was in charge of hiring experts and conducting the investi-
gation.  Abell gave the opening statement in the guilt phase of the
case—a decision that was made about ten minutes beforehand, alt-
hough he was "fairly well prepared to go on with it."  Howell had
told him a day or two before trial that he was not going to be at the
trial.  In his opening statement, Abell focused on Freeman's unsta-
ble childhood as a ward of the State of Alabama, thinking that as-
pect of the case would be developed in the sentencing phase.  Abell
was not at trial for the sentencing phase.  Abell testified on cross-
examination that the evidence of guilt against Freeman was "over-
whelming."  Howell discussed with Abell the decision to withdraw
a not-guilty plea and enter a plea of "strictly not guilty by reason of

mental disease or defect." That decision was made because "it had been tried one time in a previous trial and proved to be unsuccessful," and because they "were hoping that [they] could either gloss over or eliminate some of the more inflammatory aspects of the case, if [they] just concentrated on insanity."

Norris testified that he was appointed to represent Freeman. He was second-chair counsel at trial, as he had only been practicing two or three years at the time and Freeman's case was his first capital case. He stated that Howell had sole responsibility for the decisions in the case and selected the experts. In response to the question of whether he had "any role in deciding how best to use the information that was available about Mr. Freeman's background in terms of mitigation in front of the jury at the sentencing phase," Norris responded that he "had no control over that," as Howell "was lead counsel" and "made all the tactical decisions."

At the conclusion of the testimony, Freeman's postconviction counsel attempted to introduce an affidavit signed by Howell. Postconviction counsel explained that Howell was not testifying live because she[6] now lived in upstate New York, and funds were not available to bring Howell to Alabama.[7]    Freeman's

---

[6] By this time, Howell was known as Ally Howell.

[7] Freeman had filed a motion requesting funds for Howell to travel from New York to Alabama on July 25, 2002. The trial court denied the motion on August 5, 2002. During the postconviction proceedings, Freeman had filed other motions seeking funds to hire experts and investigators. After a hearing on

postconviction counsel had provided the State with Howell's affidavit on May 29, 2003, a week prior to the hearing. In response, the State filed a motion to exclude the affidavit, arguing that it would be prejudiced if the Court admitted Howell's affidavit into evidence because it would not be able to cross-examine Howell. At the hearing, Freeman's counsel explained that they delivered the affidavit to the State within an hour of receiving it. In response to the postconviction court's question of why the affidavit was dated May 28, Freeman's counsel explained that "[i]t took time, some communication with Ms. Howell, some back and forth arranging the affidavit," and that "[i]t took some time getting to know Ms. Howell before we could talk in enough detail about the case that the information started flowing." The postconviction court granted the State's motion to exclude the affidavit, and Howell's affidavit was ordered sealed.

On June 25, 2003, the postconviction court entered a final order denying Freeman's Rule 32 petition. After reviewing the testimony presented, the postconviction court reiterated that it had granted the State's motion to exclude Howell's affidavit[8] and would not consider the affidavit in ruling on the petition. The

---

the motions, the postconviction court entered an order denying Freeman's Request for Extraordinary Expenses.

[8] The postconviction court stated that it granted the State's motion to exclude Howell's affidavit "[b]ased on the holdings of the Alabama Court of Criminal Appeals in *Callahan v. State*, 767 So. 2d 380 (Ala. Crim. App. 1999), and *Hamm v. State*, 2002 WL 126990 (Ala. Crim App. 2002)."

postconviction court also stated that it would not consider a written proffer submitted by Freeman at the conclusion of the hearing in which Freeman alleged what he could have proven if the postconviction court had granted his motion for funds.

As to ground "J"—Freeman's claim that his trial counsel failed to investigate and present available evidence of mitigation—the postconviction court found that Freeman "presented *absolutely no evidence at his evidentiary hearing concerning this claim*. . . . Freeman has failed to meet his *burden of proving* trial counsel's alleged failure to investigate and present mitigating evidence was the result of deficient performance or caused him to be prejudiced as required by *Strickland*. Rule 32.3, ARCrP."[9] (Emphasis added). The postconviction court thus denied the claim.

Regarding ground "K"—Freeman's claim that trial counsel were ineffective in their presentation of mitigating evidence—the postconviction court found that Freeman "*failed to offer any evidence at his evidentiary hearing* proving that if trial counsel had presented the evidence of his background and mental health history in a different manner, the outcome of his trial would have

---

[9] Alabama Rule of Criminal Procedure 32.3 provides as follows:

> The petitioner shall have the burden of pleading and proving by a preponderance of the evidence the facts necessary to entitle the petitioner to relief. The state shall have the burden of pleading any ground of preclusion, but once a ground of preclusion has been pleaded, the petitioner shall have the burden of disproving its existence by a preponderance of the evidence.

been different." (Emphasis added). As a result, Freeman "*failed to meet his burden of proving* that trial counsel was either deficient in presenting mitigation evidence or that this presentation caused him to be prejudiced as required by *Strickland*. Rule 32.3, ARCrP." (Emphasis added). As such, the postconviction court denied the claim.

Freeman then appealed the denial of his Rule 32 petition to the Alabama Court of Criminal Appeals. In his brief to the Alabama Court of Criminal Appeals, Freeman raised nine grounds for reversal, including nine individual sub-claims of ineffective assistance of trial counsel.[10] Relevant here, Freeman merged grounds "J" and "K" from his Rule 32 petition and argued that the postconviction court erred in denying relief on his claim that trial counsel were ineffective "for failing to investigate, develop and present available evidence of petitioner's background and mental health problems in a manner that would have permitted the jury to give such evidence mitigating effect." Specifically, Freeman argued that his "absence of an evidentiary presentation" in the postconviction court was due solely to its denial of his request for funds to obtain "expert and investigative assistance." Freeman also argued that his trial counsel's decision to rely strictly on an "insanity" defense was unreasonable and "squandered the mitigating value of the

---

[10] Among other things, Freeman argued that the postconviction court erred in "denying [his] requests for funds necessary to develop and present the factual bases of [his] claims" and in "excluding the affidavit of lead trial counsel, Ally W. Howell, and the proffer of evidence submitted by petitioner."

18-13995            Opinion of the Court              27

information about [Freeman's] background" because it "diverted the jury's attention and the defense's resources" from a mitigation case. He argued that trial counsel could have presented a substantial mitigation case with the documentation available at trial along with the assistance of experts, like a mitigation investigator, a social worker, and a neuropsychologist, and that there existed a reasonable probability that the result of the sentencing proceeding would have been different had trial counsel done so.

On June 17, 2005, the Alabama Court of Criminal Appeals issued an unpublished memorandum decision affirming the judgment of the postconviction court denying Freeman's Rule 32 petition. *Freeman v. Alabama*, No. CR-02-1971 (Ala. Crim. App. June 17, 2005). As an initial matter, the Alabama Court of Criminal Appeals held that Freeman was not entitled to an evidentiary hearing in the postconviction court on his claim of ineffective assistance of counsel because "none of his allegations were pleaded with sufficient specificity to satisfy the requirements in Rule 32.3 and Rule 32.6(b)."[11] *Id.* at 15. The court also noted that Freeman had

---

[11] Alabama Rule of Criminal Procedure 32.6(b) provides as follows:

> **(b) Specificity.** Each claim in the petition must contain a clear and specific statement of the grounds upon which relief is sought, including *full disclosure of the factual basis of those grounds.* A bare allegation that a constitutional right has been violated and mere conclusions of law shall not be sufficient to warrant any further proceedings.

(Emphasis added).

"attempt[ed] to include more specific facts in his brief on appeal with respect to many of his allegations of ineffective assistance of counsel." *Id.* at 15 n.8. Those facts, which the court did not specify, were not considered by the court. *Id.*

As to ground "J" and "K" of Freeman's Rule 32 petition, the appellate court held:

> Freeman did not allege in his petition *what "available evidence" there was about his background or mental health history that his counsel did not present* or what "manner" he believes his counsel should have presented the unidentified evidence. Likewise, other than the conclusory allegation that but for counsel's conduct in this regard, there was a reasonable probability that the outcome of his trial would have been different, Freeman alleged no facts tending to indicate that he was prejudiced by counsel's preparation for and conducting of the penalty phase of his trial. His contentions in this regard are *vague and conclusory and wholly insufficient to satisfy his burden of pleading.* Therefore, denial of these allegations of ineffective assistance of trial counsel was proper.

*Id.* at 24–25 (emphasis added). The Alabama Court of Criminal Appeals affirmed the judgment of the postconviction court and subsequently denied rehearing on July 29, 2005. The Supreme Court of Alabama denied Freeman's petition for writ of certiorari on January 20, 2006, in an unelaborated order. *Ex parte Freeman*, 971 So. 2d 749 (Ala. 2006) (Table). And the United States Supreme Court

18-13995                Opinion of the Court                29

denied certiorari on June 26, 2006. *Freeman v. Alabama*, 548 U.S. 910 (2006).

## C. Federal Proceedings

On February 16, 2006, Freeman filed his § 2254 federal habeas petition in the Middle District of Alabama. As ground IV for relief, Freeman alleged that he was denied effective assistance of trial counsel. Freeman acknowledged that he did not "fully prove his allegations at the state court evidentiary hearing" and claimed that the failure was due to the Alabama courts' denial of his request for funds to hire experts and investigators and for travel expenses for Ally Howell to testify at the postconviction hearing. Freeman claimed that his allegations of ineffective assistance of trial counsel "will have evidentiary support upon a reasonable opportunity for further fact development."

Relevant here, in ground IV.E, Freeman claimed that he was denied the effective assistance of trial counsel due to "trial counsel's failure to investigate, develop, and present evidence of [Freeman's] background and mental health problems in a manner that would have allowed the jury to give it mitigating effect." Freeman reiterated the argument he made to the Alabama Court of Criminal Appeals in his postconviction appeal—that trial counsel had "squandered the mitigating value of the information about [Freeman's] background" by using the information "exclusively on an ill-conceived effort to establish that petitioner was not guilty by reason of mental disease or defect." Freeman repeated his argument that with the documentation about Freeman's life that was available at

trial, and with the assistance of a mitigation investigator, a social worker, and a neuropsychologist, trial counsel could have presented the jury with substantial evidence for mitigation. Freeman further argued that trial counsel's decision to rely on an "insanity defense" was unreasonable, and diverted the jury's attention and the defense's resources from "the truly compelling mitigating case that could have been made." But for counsel's failure, Freeman asserted, a reasonable probability existed that the result of sentencing would have been different.

On May 8, 2006, the Commissioner of the Alabama Department of Corrections (the "State"), filed an answer to Freeman's petition. The State argued that Freeman did not raise in his Rule 32 petition his present claim that focusing on the defense of mental disease or defect "squandered the mitigating value of the information about [Freeman's] background," that, therefore, the claim was not fairly presented to the state courts and was not exhausted, and that dismissal to allow Freeman to raise the claim in state court would be futile. In the alternative, the State argued that Freeman's one-sentence claim in his Rule 32 petition that "trial counsel failed to present available evidence regarding [Freeman's] background and his mental health history to the jury in a manner which would have allowed the jury to give this evidence mitigating effect during the sentencing phase" was dismissed by the Alabama Court of Criminal Appeals for failure to comply with Rules 32.3, 32.6(b), and

32.7(d), and was therefore procedurally defaulted.[12] With regard to Freeman's claims that trial counsel were ineffective for failing to present a mitigation investigator, social worker, and neuropsychologist at trial, the State argued that those claims were not fairly presented to the state courts and therefore had not been exhausted. And the State argued that those claims were also not raised in Freeman's Rule 32 petition and constituted a procedural default under state law. Furthermore, the State asserted that, although Freeman attempted to raise the issues in his brief before the Alabama Court of Criminal Appeals, these arguments were not considered by the appellate court because they were raised for the first time on appeal, and are procedurally defaulted on this basis.

The State filed its initial brief on procedural default and evidentiary hearing issues on March 19, 2007. The State argued that Freeman's claim of ineffective assistance of counsel based on failure to present evidence of his background and mental health problems was procedurally defaulted because this claim was dismissed under an independent and adequate state procedural rule—specifically, the Alabama Court of Criminal Appeals rejected the claim

---

[12] This Court has since clarified that an Alabama state court's dismissal of a federal constitutional claim for failure to plead a sufficient factual basis under Rule 32.6(b) is a ruling on the merits that does not preclude federal habeas review under the procedural-default doctrine. *Borden v. Allen*, 646 F.3d 785, 812 (11th Cir. 2011) (reviewing a claim dismissed pursuant to Alabama Rules of Criminal Procedure 32.3 (burden of proof), 32.6(b) (specificity), and 32.7(d) (summary dismissal)); *Frazier v. Bouchard*, 661 F.3d 519, 524–25 & n.6 (11th Cir. 2011) (same).

under Rules 32.3 and 32.6(b).  The State also argued that the claim was procedurally defaulted because it was never fairly presented in state court.  Specifically, Freeman had "add[ed] considerably to his claim" and now alleged that his trial counsel should have hired experts.  Because new legal theories and factual claims that were not presented to the state court do not satisfy the exhaustion requirement, and because any state remedy at this point would be barred on several grounds in state court, Freeman's claim was procedurally defaulted, according to the State.  Finally, the State noted that, where a federal habeas petition alleges a different legal theory or a new factual claim with respect to an issue raised in state court, the exhaustion requirement is not met.  The State contended that Freeman was not entitled to an evidentiary hearing on any of the procedurally defaulted claims because he had not shown cause and prejudice to overcome the procedural defaults.

On April 16, 2007, Freeman filed his brief on the merits and in opposition to the State's brief on procedural default.  Freeman argued that his claim of ineffective assistance of counsel was not procedurally defaulted as a result of the Alabama Court of Criminal Appeals' invocation of Rules 32.3 and 32.6 in affirming the postconviction trial court's denial of his fourth amended rule 32 petition.  Specifically, Freeman argued that there was no procedural default because, as applied by the Alabama Court of Criminal Appeals, Rules 32.3 and 32.6 were not independent of federal law, and did not constitute an adequate ground for withholding merits review.  Even if the Alabama appellate court's application of Rules 32.3 and

32.6 was adequate and independent, Freeman claimed the circumstances here constituted "cause" to overcome the resulting procedural bar.

With regard to the "additional facts" and "additional evidence" that he set forth in his federal habeas petition, Freeman argued that they did not fundamentally alter his claim as set forth before the Alabama Court of Criminal Appeals and therefore did not offend the exhaustion requirement. Freeman then proceeded to set forth almost twenty pages of mitigation information that he claims should have been presented at trial. Freeman claimed that this "more extensive information" was developed in an investigation conducted for the federal habeas proceedings. This new information was based on "witness interviews conducted by a trained investigator and planned with the assistance of experts who had reviewed the record and interviewed [Freeman]." None of the new factual allegations obtained in the investigation for the federal habeas proceedings were supported by affidavit or report, or sworn to in any way.

Among the information gathered in the habeas investigation was a claim that Freeman was sexually abused. It was alleged that Freeman's younger brother, Jimmy Terry, saw Freeman being sexually abused by Thomas Smith, the husband of Freeman's older stepsister, Edna Smith, while they were living with her. It was further alleged that the investigation revealed that Jimmy Terry and Freeman were physically abused while with the Smiths. Ms. Packer, a worker at St. Mary's, where Freeman had been sent to

live at the age of nine, believed that Freeman was sexually abused by Alexander Moore, who was the "house dad" at the group home. Alexander Moore was the sole witness presented by trial counsel during the penalty phase. Freeman claimed that he had "repressed the memories of his abuse, and was therefore incapable of directing post-conviction counsel toward that information."

Freeman further obtained the services of an unidentified social worker who "performed a thorough review of the records, conducted interviews, and examined additional information gathered during the investigation." She determined that Freeman's "entire life had been marked by rejection, trauma, abuse, and mistreatment." The social worker determined that Freeman had a long history of being misdiagnosed and that his "'conduct' problem" was caused by sexual abuse and trauma. Freeman also retained an unidentified neuropsychologist who "was provided with the documents contained in the record as well as the additional information gathered through a competent investigation," who found that Freeman suffered from post-traumatic stress disorder ("PTSD") and had shown signs of disassociation.

Additionally, Freeman argued that his trial counsel's mitigation preparation was deficient and "not materially distinguishable from" that in *Wiggins v. Smith*, 539 U.S. 510 (2003), and that he was prejudiced as a result. Finally, Freeman sought an evidentiary hearing in the federal habeas proceeding, arguing that he had been denied the funds necessary to develop his claims in state court and that the facts he alleged, if true, would entitle him to relief.

The State filed a brief on the merits on July 19, 2007. The State argued that Freeman's claims should be denied review altogether, or at least "severely restricted," because his pleadings before the federal habeas court added significant new factual allegations not pleaded below, thus denying the state courts a full and fair opportunity to decide Freeman's constitutional claims. As such, the new legal theories and new factual claims set forth in the federal habeas petition should be deemed unexhausted. Additionally, the State argued that the new allegations were procedurally defaulted, as they would now be barred on several grounds in state court. And the State asserted that federal habeas relief was foreclosed because Freeman had not established that he was entitled to relief pursuant to § 2254(d)(1)–(2).

More than twelve years after Freeman filed his federal habeas petition, the district court entered a 270-page Memorandum Opinion and Order denying Freeman's "original federal habeas corpus petition (Doc. # 5), as supplemented by the new facts alleged in his brief in support (Doc. # 64)" on July 2, 2018. Before addressing the merits of Freeman's claim for federal habeas relief based on ineffective assistance of trial counsel, the district court began its analysis by noting that the Alabama Court of Criminal Appeals had concluded that Freeman's ineffective assistance claims were "bereft of any evidentiary support and lacked merit." The district court's "independent examination of [Freeman's] fourth amended Rule 32 petition [was] consistent with [the] conclusion" of the Alabama Court of Criminal Appeals that "none of [his]

ineffective assistance 'claims were pleaded with sufficient specificity to satisfy the requirements in Rule 32.3 and 32.6(b).'"

The district court found that Freeman's federal habeas petition presented "completely different, somewhat more factually detailed" ineffective assistance claims than had been presented in Alabama state court. The district court further found:

> Freeman's "new" ineffective assistance complaints are more factually specific than the conclusory claims he fairly presented to the state circuit court in his Rule 32 proceeding. Insofar as [Freeman] presents this court with new ineffective assistance claims, this court will undertake *de novo* review of those claims consistent with 28 U.S.C. § 2254(b)(2).[13]

The district court reasoned that "concerns of judicial economy justify the federal habeas court's consideration and rejection on the merits of the new claims, rather than stay and abatement to permit the petitioner's dilatory and useless return to state court to exhaust state habeas remedies" where a federal habeas petitioner "as here . . . presents meritless or even frivolous *new versions* of conclusory ineffective assistance claims his state habeas court previously rejected on the merits." (Emphasis added).

---

[13] Section 2254(b)(2) provides that "[a]n application for a writ of habeas corpus may be *denied* on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(2) (emphasis added).

Consistent with this conclusion, the district court reviewed Freeman's claim that his trial counsel failed to investigate, develop, and present mitigating evidence under § 2254(d) in part, and *de novo*, in part.

First, as to the claim asserted in Alabama state court, the district court conducted review under § 2254(d), and found as follows:

> [Freeman] alleged no specific facts and presented no evidence to the circuit court during his Rule 32 proceeding evidentiary hearing supporting these particular ineffective assistance complaints.    Moreover, [Freeman] failed to allege with any reasonable degree of specificity exactly what new or additional mitigating evidence his trial counsel should have presented during [his] June 1996 capital murder trial.    Under such circumstances, the circuit court's and Alabama Court of Criminal Appeals' conclusions that these complaints failed to satisfy either prong of the *Strickland* standard was neither (1) contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in [Freeman's] state trial and mandamus proceedings.

The district court then reviewed de novo what it construed as Freeman's "new factual allegations supporting his vague and conclusory *Wiggins* complaints about unpresented mitigating evidence . . . , identifying allegedly 'new'" mitigation evidence.    After

"thoroughly examin[ing] the entire record" from the 1996 trial, including various state exhibits, and the testimony of Dr. Burkhart, Dr. Renfro, and Freeman's former childcare worker, Copeland, the district court found that "trial counsel presented an extensive case in mitigation," and that "this is not a case in which defense counsel failed to present extensive available mitigating evidence." The district court also found that, with two exceptions, "all of the 'new' mitigating evidence" Freeman identified in support of his *Wiggins* claims was "either available to [his] trial counsel or actually presented" to the sentencing jury.

With regard to Freeman's allegations of sexual abuse, the district court concluded that, "[o]n this record, and after independent, *de novo* review, the failure of [Freeman's] June 1996 trial counsel to investigate potential child sexual abuse inflicted upon [Freeman] did not cause the performance of [his] trial counsel to fall below an objective level of reasonableness." Specifically, the district court cited to extensive documentation of psychological evaluations in the state court record as establishing "that, throughout his developmental period, [Freeman] consistently either (1) failed to make any allegation of sexual abuse or (2) denied any sexual contact whatsoever." Freeman did not allege that he told his trial counsel that he had been a victim of sexual abuse. Thus, Freeman alleged no facts and presented no evidence "establishing it was objectively unreasonable for his June 1996 trial counsel to refrain from investing their limited time and energy in an investigation of potential child sexual abuse inflicted upon [him]."

18-13995                Opinion of the Court                39

Similarly, as to Freeman's allegation that he suffered from PTSD, the district court concluded that the failure of trial counsel to investigate potentially mitigating evidence of neurological disorders, including PTSD, "did not cause the performance of [Freeman's] trial counsel to fall below an objective level of reasonableness." None of the mental health evaluations conducted prior to Freeman's first trial diagnosed him with PTSD. Moreover, the court explained:

> [T]he testimony of Dr. Burkhart, Dr. Renfro, and Dr. Dixon revealed a variety of mental health diagnoses, including Conduct Disorder, Adjustment Reaction, Adjustment Disorder, Borderline Personality Disorder, Schizotypal Personality Disorder, and Antisocial Personality Disorder. [Freeman] offers no specific facts and no evidence showing his trial counsel were aware, or reasonably should have been aware, of any information suggesting that a neurological examination of [Freeman] by a neuropsychologist in June 1996 would have produced any new or different mitigating evidence beyond that already available to [his] defense team.

Finally, the district court found that there was "nothing objectively unreasonable" with either "the scope of the investigation into potentially mitigating evidence undertaken by [Freeman's] trial counsel" or "the manner with which [Freeman's] trial counsel presented their mitigating evidence through the lengthy, detailed, testimony of Dr. Burkhart, Dr. Renfro, and Ms. Copeland (which must be viewed in conjunction with the many detailed exhibits

introduced into evidence near the conclusion of Dr. Burkhart's testimony)." The court noted that presenting the same evidence "in anecdotal form from members of [Freeman's] family" during the penalty phase "might very well have undermined the theme of [his] case in mitigating, *i.e.*, that [Freeman] had been separated from, and deprived of stable relationships with, his family as a child - which led him to develop Schizotypal or Borderline Personality Disorder." Thus, the district court found that Freeman's complaint of ineffective assistance of trial counsel for failure to investigate, develop, and present mitigating evidence, based on factual allegations raised for the first time in his federal habeas corpus petition, did not satisfy the deficient performance prong of *Strickland v. Washington*, 466 U.S. 668 (1984).

Next, the district court found that Freeman also failed to establish the prejudice prong of the *Strickland* standard. The court explained that, to the extent Freeman argued that an unidentified social worker and an unidentified neuropsychologist could have provided helpful testimony during the penalty phase, Freeman failed "to identify any such expert or to proffer an affidavit, sworn declaration, or other properly authenticated documentation showing what testimony each such expert could have furnished had they been called at [his] June 1996 capital murder trial." And the court noted that Freeman failed to allege any facts or evidence showing that these witnesses were available and willing to testify at the trial. Such conclusory allegations, the district court found, failed to satisfy the prejudice prong of *Strickland*.

Likewise, the district court found that—having reviewed the "extensive mitigating evidence" presented at trial through "[v]oluminous records," and trial testimony from Dr. Renfro, Dr. Burkhart, and Copeland—there was no reasonable probability that the outcome of the sentencing phase would have been different had trial counsel presented the anecdotal testimony from Freeman's family members or others concerning Freeman being sexually abused. Freeman did not provide any affidavits or other evidence showing that Freeman or anyone else was available and willing to testify at the 1996 trial that Freeman was sexually abused. Moreover, any such testimony "would have been subject to potentially devastating cross-examination based upon the failure of those same witnesses to report their suspicions of child abuse to responsible law enforcement authorities or child protective services officers in a timely manner."

Finally, the district court found that the evidence of guilt was overwhelming, as were the aggravating facts that Freeman committed "multiple intentional murders during the course of a burglary, robbery, and rape." The evidence was also overwhelming that the murders were "heinous, atrocious, and cruel."

For all the above reasons, the district court found there was "no reasonable probability that, but for the failure of [Freeman's] trial counsel to present any of the 'new' mitigating evidence identified in [his] pleadings in this court, the outcome of the punishment phase of [Freeman's] June 1996 capital murder trial would have been different." Thus, the district court concluded that (1)

under *de novo* review, Freeman's ineffective assistance of trial counsel claim failed to satisfy either prong of *Strickland*, and (2) under the Antiterrorism and Effective Death Penalty Act of 1996's ("AEDPA") deferential review, the Alabama Court of Criminal Appeals' rejection on the merits of the claims made in the Rule 32 proceeding did not warrant relief pursuant to § 2254(d).

The district court also denied Freeman's request for an evidentiary hearing for two reasons. First, even assuming the truth of all of Freeman's "new potentially mitigating information," the district court found that Freeman had not established *Strickland* prejudice. Second, Freeman failed to proffer any affidavit or sworn declaration in support of his new evidence. The district court found that there was "no need for an evidentiary hearing in federal court where a federal habeas petitioner fails to proffer any evidence he would seek to introduce at a hearing."[14]

---

[14] In denying Freeman's request for an evidentiary hearing, the district court relied on several decisions from this Court. *See, e.g., Jones v. Sec'y, Fla. Dep't of Corr.*, 834 F.3d 1299, 1320 (11th Cir. 2016) (finding that the district court did not abuse its discretion in failing to grant petitioner an evidentiary hearing in a habeas corpus proceeding where the only evidence petitioner presented in federal court was bare allegations from state Rule 3.850 motion and petitioner never submitted an affidavit in state or federal court supporting specifics of claim; "Jones had not presented enough by way of specific factual averment or proffer to entitle him to an evidentiary hearing on this claim."), *Hamilton v. Sec'y, Fla. Dep't of Corr.*, 793 F.3d 1261, 1266 (11th Cir. 2015) ("A § 2254 petitioner is not entitled to an evidentiary hearing if he fails to 'proffer evidence that, if true, would entitle him to relief.'" (quoting *Pope v. Sec'y for*

18-13995               Opinion of the Court                    43

The district court ultimately denied "[a]ll relief requested in [Freeman's] original federal habeas corpus petition (Doc. #5), as supplemented by the new facts alleged in his brief in support (Doc. #64)." The district court also denied Freeman a certificate of appealability. Final judgment was entered on July 2, 2018. On July 27, 2018, Freeman filed a motion to alter or amend the judgment under Federal Rule of Civil Procedure 59(e), which the district court denied on August 15, 2018.

On October 5, 2018, Freeman filed a motion for a certificate of appealability in this Court. Relevant here, Freeman argued that "[r]easonable jurists could disagree with the district court's procedural handling of Mr. Freeman's substantial claims of ineffective assistance of counsel." Specifically, Freeman argued that: (1) even accepting the district court's characterization of Freeman's ineffective assistance of trial counsel claims that differ from the ineffective assistance of trial counsel claims presented in the Rule 32 proceeding as "new" claims, the claims are procedurally defaulted, not unexhausted, and therefore reasonable jurists could disagree with the district court when it disposed of Freeman's claims under § 2254(b)(2) rather than under the rules of procedural default; (2) even if Freeman's claims are unexhausted and eligible for review

_Dep't of Corr._, 680 F.3d 1271, 1291 (11th Cir. 2012))), and _Chandler v. McDonough_, 471 F.3d 1360, 1363 (11th Cir. 2006) (finding that the district court did not err in not granting an evidentiary hearing to the petitioner where the petitioner made no proffer to the district court of any evidence that he would seek to introduce at a hearing).

under § 2254(b)(2), the district court exceeded the limits of review by conducting de novo review instead of determining whether Freeman raises a colorable federal claim; (3) the district court's de novo review was not a true de novo review because it generated its own bases for seeing trial counsel's errors in a light more favorable to the State; and (4) Freeman's ineffective assistance of trial counsel claims should be analyzed under the rules of procedural default pursuant to *Martinez v. Ryan*, 566 U.S. 1 (2012), and *Trevino v. Thaler*, 569 U.S. 413 (2013).

On December 2, 2019, this Court granted Freeman's motion for a certificate of appealability, in part, specifically with respect only to the following claim: "Whether trial counsel provided ineffective assistance of counsel in violation of the Sixth Amendment to the United States Constitution when at the penalty phase of trial, it failed to conduct a reasonable mitigation investigation and failed to uncover and present mitigation evidence." This appeal ensued.

## II.    STANDARD OF REVIEW

"When reviewing a district court's grant or denial of habeas relief, 'we review questions of law and mixed questions of law and fact *de novo*, and findings of fact for clear error.'" *Reaves v. Sec'y, Fla. Dep't of Corr.*, 717 F.3d 886, 899 (11th Cir. 2013) (quoting *Nyland v. Moore*, 216 F.3d 1264, 1266 (11th Cir. 2000)). "An ineffective assistance of counsel claim is a mixed question of law and

fact subject to *de novo* review." *McNair v. Campbell*, 416 F.3d 1291, 1297 (11th Cir. 2005).

The issue of claim exhaustion presents a mixed question of law and fact, and a "district court's ultimate conclusion that a claim is exhausted is subject to *de novo* review." *Fox v. Kelso*, 911 F.2d 563, 568 (11th Cir. 1990). Likewise, "[w]e review a district court's determination as to whether a habeas petitioner is procedurally barred from raising a claim in federal court *de novo*." *Kelley v. Sec'y for Dep't of Corr.*, 377 F.3d 1317, 1345 (11th Cir. 2004).

## III.    ANALYSIS

On appeal, Freeman argues that that the district court erred in denying his federal habeas petition on his claim that his trial counsel rendered ineffective assistance of counsel in their investigation and presentation of mitigating evidence at the penalty phase of his trial. Significantly, Freeman's argument on appeal concerns only the claims of ineffective assistance of trial counsel that the district court reviewed de novo under § 2254(b)(2) of AEDPA. Freeman, however, does not make a separate argument addressing the district court's denial of relief under § 2254(d) of AEDPA.

In response, the State argues that the district court correctly held that the Alabama state courts' denial of Freeman's claim of ineffective assistance of trial counsel was not unreasonable. The State further argues that the district court "should have concluded its analysis with a review of the state court's decisions" under § 2254(d). Specifically, the State asserts that it was unnecessary for

the district court to conduct de novo review of the "new" claims of ineffective assistance of counsel because they were not presented to the Alabama state courts and therefore are not exhausted—in essence, arguing that the claims are procedurally defaulted. The State alternatively argues that the district court's de novo review is sound such that its denial of Freeman's petition should be affirmed. But Freeman, in reply to the State's arguments, contends that "[t]he question of whether the District Court should have reviewed *de novo* is not properly before the Court." Freeman asserts that our review is limited to the issue defined in the certificate of appealability, i.e., whether his trial counsel provided ineffective assistance of counsel in its investigation and presentation of mitigation evidence.

We first address the scope of the issues specified for review by our COA and then turn to the merits of the case.

### A. Issues specified for review in this Court's COA

Pursuant to 28 U.S.C. § 2253(c)(3), a COA "shall indicate which specific issue or issues" are subject to review from a final habeas corpus proceeding. To that end, this Court has held that "[i]t is abundantly clear that 'our review is restricted to the issues specified in the certificate of appealability.'" *Spencer v. Sec'y, Dep't of Corr.*, 609 F.3d 1170, 1180 (11th Cir. 2010) (quoting *Williams v. Allen*, 598 F.3d 778, 795 (11th Cir. 2010)). However, we will construe the issue specified in the COA "in light of the pleadings and other parts of the record." *Murray v. United States*, 145 F.3d 1249, 1251 (11th Cir. 1998); *see also, e.g., McClain v. Hall*, 552 F.3d 1245,

1254 (11th Cir. 2008) (refusing to consider appellant's claim that his trial counsel was ineffective for failing to discover and present certain mitigating evidence where this Court granted a COA as to whether appellant's trial counsel "rendered ineffective assistance in his investigation of mitigating evidence for the penalty phase of the trial" and the specific claim was not made in appellant's request for a COA or in his state and federal habeas petitions).  We will also construe the COA to encompass any issue that "must be resolved before reaching the merits" of a claim identified in the COA.  *Santos v. United States*, 982 F.3d 1303, 1309 n.3 (11th Cir. 2020).

Here, Freeman contends the State's argument about the district court's de novo review of his claims that the State asserts are unexhausted and procedurally defaulted is beyond the scope of the COA in this case and should not be considered by this Court.  But whether Freeman's claims are barred from federal review, and if not, what legal standard applies, are threshold procedural issues that must be resolved before we can reach the merits of his Sixth Amendment claims.  *See McCoy v. United States*, 266 F.3d 1245, 1248 n.2 (11th Cir. 2001) (resolving procedural-default and retroactivity issues not specified in the COA).

Thus, we will consider the issue of whether Freeman's claims that his trial counsel provided ineffective assistance during the penalty phase were exhausted or procedurally defaulted.  *See id.*, 266 F.3d at 1248 n.2; *cf. Rozzelle v. Sec'y, Fla. Dep't of Corr.*, 672 F.3d 1000, 1009–10 (11th Cir. 2012) (determining that a

threshold issue was "[n]ecessarily subsumed" within the COA, even though the COA did not expressly include the issue).

## B.  The district court's review of Freeman's "new" claims under § 2254(b)(2)

Under § 2254(d), "[a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim" either "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  But § 2254(b)(2) provides that "[a]n application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."

Here, the district court reviewed some of Freeman's claims "*de novo*" under § 2254(b)(2).  The court explained that Freeman presented "completely different, somewhat more factually detailed, versions of his ineffective assistance complaints aimed at the performance of his trial counsel."  The court found that these claims were "new" and "more factually specific than the conclusory claims he fairly presented to the state circuit court."  The district court determined that, to the extent Freeman presented new ineffective assistance claims, it would undertake de novo review of

the claims under § 2254(b)(2).  The district court explained its reasons for conducting this review:

> When, as here, a federal habeas corpus petitioner presents meritless or even frivolous new versions of conclusory ineffective assistance claims his state habeas court previously rejected on the merits, concerns of judicial economy justify the federal habeas court's consideration and rejection on the merits of the new claims, rather than stay and abatement to permit the petitioner's dilatory and useless return to state court to exhaust state habeas remedies on such meritless claims.

Because the district court characterized Freeman's claims of ineffective assistance of trial counsel—to the extent they relied on newly-presented factual allegations—as new and therefore unexhausted, the State argues that the district court should not have reviewed them de novo, but instead should have considered the new claims procedurally barred.

"Before a federal court may grant habeas relief to a state prisoner, the prisoner must exhaust his remedies in state court." *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999); *accord Ogle v. Johnson*, 488 F.3d 1364, 1368 (11th Cir. 2007) ("The habeas statute requires applicants to exhaust all available state law remedies before filing a federal habeas petition."); 28 U.S.C § 2254(b)(1)(A).  "Under the exhaustion requirement, a habeas petitioner challenging a state conviction must first attempt to present his claim in state court." *Harrington v. Richter*, 562 U.S. 86, 103 (2011); *see also Picard v.*

*Connor*, 404 U.S. 270, 276 (1971) ("Only if the state courts have had the first opportunity to hear the claim sought to be vindicated in a federal habeas proceeding does it make sense to speak of the exhaustion of state remedies."). "The exhaustion requirement springs from principles of comity, which protect the state court's role in the enforcement of federal law and prevent disruption of state court proceedings." *Ward v. Hall*, 592 F.3d 1144, 1156 (11th Cir. 2010). "Consistent with the purpose of the exhaustion rule, 'state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process.'" *Pruitt v. Jones*, 348 F.3d 1355, 1359 (11th Cir. 2003) (quoting *O'Sullivan*, 526 U.S. at 845); *accord Ward*, 592 F.3d at 1156 ("[T]o exhaust state remedies, a petitioner must fairly present every issue raised in his federal petition to the state's highest court, either on direct appeal or on collateral review."). In the context of a habeas proceeding in the Alabama state courts, one complete round of Alabama's established appellate review process means that the claim must be presented on appeal to the Alabama Court of Criminal Appeals and on petition for discretionary review to the Alabama Supreme Court. *See Pruitt*, 348 F.3d at 1359.

"[O]nce the federal claim has been fairly presented to the state courts, the exhaustion requirement is satisfied." *Picard*, 404 U.S. at 275; *accord McNair*, 416 F.3d at 1302. "The Supreme Court has instructed us that if 'the substance of a federal habeas corpus claim [was] first . . . presented to the state courts,' '*despite*

18-13995                Opinion of the Court                51

*variations in the . . . factual allegations urged in its support*,' the claim is exhausted." *Pope v. Sec'y for Dep't of Corr.*, 680 F.3d 1271, 1286 (11th Cir. 2012) (alterations in original) (emphasis added) (quoting *Picard*, 404 U.S. at 277–78).  In accordance with this principle, this Court has stated that the claims petitioners present in their federal habeas petition are not required to be "carbon copies of the claims they presented to the state courts." *Kelley*, 377 F.3d at 1344.  Rather,

> [w]e recognize that habeas petitioners are permitted to clarify the arguments presented to the state courts on federal collateral review provided that those arguments remain *unchanged in substance*. . . We simply require that petitioners present their claims to the state courts such that the reasonable reader would understand each claim's particular legal basis and *specific factual foundation*.

*Id.* at 1344–45 (emphasis added); *accord McNair*, 416 F.3d at 1302. And "courts should exercise flexibility in determining whether defendants have met [the exhaustion] requirement." *Pope*, 680 F.3d at 1286 (quoting *Cummings v. Dugger*, 862 F.2d 1504, 1507 (11th Cir. 1989)).

With these principles in mind, we conclude that Freeman's claim of ineffective assistance of trial counsel was exhausted in state court.  In Freeman's fourth amended Rule 32 petition filed in Alabama state court, he alleged as follows:

J. Trial counsel failed to investigate, develop and present available evidence in mitigation of petitioner's punishment. But for counsel's deficient performance, there exists a reasonable probability that the result of petitioner's trial would have been different.

K. Trial counsel failed to present available evidence regarding petitioner's background and his mental health history to the jury in a manner which would have allowed the jury to give this evidence mitigating effect during the sentencing phase. But for counsel's deficient performance, there exists a reasonable probability that the result of petitioner's trial would have been different.

Freeman's claim in state court did not contain *any* factual allegations in support of his claim that his trial counsel were ineffective in failing to investigate and present "substantial evidence" of mitigation. His allegations remained largely unchanged in his briefing to the Alabama Court of Appeals and the Supreme Court of Alabama.

And Freeman's federal habeas petition raised the same legal (and conclusory) basis for his claim of ineffective assistance of counsel as it was presented in the Alabama state courts. Freeman claimed that his trial counsel failed "to investigate, develop, and present evidence of [Freeman's] background and mental health problems in a manner that would have allowed the jury to give it mitigating effect." Freeman reiterated the argument he made to the Alabama courts—that trial counsel had "squandered the

mitigating value of the information about [Freeman's] background" by couching this information "almost entirely" in terms of the "ill-conceived effort to establish that petitioner was not guilty by reason of mental disease or defect." He repeated his argument that, with the documentation about Freeman's life that was available at trial, and with the assistance of a mitigation investigator, a social worker, and a neuropsychologist, trial counsel could have presented the jury with substantial evidence of mitigation. He further argued that trial counsel's decision to rely "strictly on an insanity defense that lacked evidentiary support" was "objectively unreasonable," and diverted resources from the case for mitigation.

However, when Freeman filed his district court brief on the merits, he set forth almost twenty pages of extensive factual allegations in support of his claim that his counsel were ineffective for failure to investigate, develop, and present evidence of his background and mental health problems in a manner that would have allowed the jury to give it mitigating effect. In that brief on the merits, Freemen alleged mitigation information concerning abuse and neglect he suffered while in state care from the time he was a baby until he was eighteen years old. Freeman claimed this "more extensive information" was developed in an investigation conducted for the federal habeas proceedings. The information was obtained only after a social worker and psychologist reviewed the documents admitted into evidence at trial and "saw strong indications of possible sexual abuse," and after a mitigation specialist

conducted interviews.  None of the factual allegations were sup-
ported by affidavit or sworn to in any way, although some of the
allegations were supported by citations to the exhibits entered at
trial.  Among the information gathered in the investigation was a
claim that Freeman was sexually abused.  Specifically, the new fac-
tual allegations included a claim that Freeman's brother, Jimmy
Terry, saw Freeman being sexually abused by Thomas Smith, the
husband of Freeman's older stepsister, Edna Smith, while they
were living with her.  Additionally, Ms. Packer, a worker at St.
Mary's, believed that Freeman was sexually abused during his time
there.

        Additionally, Freeman obtained the services of an unidenti-
fied social worker who "performed a thorough review of the rec-
ords, conducted interviews, and examined additional information
gathered during the investigation."  She determined that Free-
man's "entire life" had been marked by rejection, trauma, physical
and sexual abuse, and mistreatment.  Freeman alleged that the so-
cial worker determined that "[m]any of the individuals who inter-
acted with [Freeman] were not qualified to provide proper care and
treatment, and consequently failed to identify (or perhaps to even
look for) the cause of what was labeled early on as a 'conduct' prob-
lem:  the sexual abuse and trauma that young [Freeman] suffered."
Freeman also retained an unidentified neuropsychologist who
"was provided with the documents contained in the record as well
as the additional information gathered through a competent

investigation" and found that Freeman suffered from PTSD and had shown signs of disassociation.

Although the question of exhaustion is a closer call than it was in *Pope*, as Freeman's claim in state court did not contain *any* factual allegations in support of his claim that his trial counsel were ineffective in failing to investigate and present "substantial evidence" of mitigation, we conclude that "the substance of" Freeman's claim was first presented to the state court, despite the "variations in the . . . factual allegations urged in its support." *See Pope*, 680 F.3d at 1295 (quoting *Picard*, 404 U.S. at 277–78). In his Rule 32 petition, Freeman claimed that his counsel "failed to present available evidence regarding petitioner's background and his mental health history to the jury in a manner which would have allowed the jury to give this evidence mitigating effect during the sentencing phase." At its core, this is the same legal issue that Freeman presented to the district court in his federal habeas petition. *Cf. id.* at 1287 ("Here, the failure-to-mitigate-at-sentencing claim as pled in Pope's federal habeas petition raised the exact same legal issue that was presented to the state court—that but for the complete absence of *any* investigation and presentation of mitigation evidence, there is a reasonable probability that the result of Pope's sentencing proceeding would have been different."). While Freeman "certainly expanded on the topics raised earlier in state court"—i.e., almost thirty pages of factual allegations of mitigation information, including explicit and lengthy allegations of physical abuse, sexual abuse, and PTSD—"we cannot ignore that they

involve the same issues." *See id.* Ultimately, the new factual allegations do not change the substance of Freeman's claim.

Having concluded that Freeman's claim as to the new factual allegations was exhausted in state court, we now turn to Freeman's claims.

## C. Freeman's claims of ineffective assistance of trial counsel

As an initial matter, we again recognize that the district court conducted de novo review of and denied Freeman's claims relating to the new factual allegations raised in his brief on the merits, instead of denying those claims as unexhausted and procedurally barred, pursuant to § 2254(b)(2). *See LeCroy v. Sec'y, Fla. Dep't of Corr.*, 421 F.3d 1237, 1261 & n.26 (11th Cir. 2005) (explaining that a federal court may alternatively deny federal habeas relief on an unexhausted federal claim on the merits under § 2254(b)(2), or on the basis of a procedural bar). However, as previously noted, we conclude that those claims were in fact exhausted. *See Pope*, 680 F.3d at 1287. However, for ease of reference, we divide our discussion of Freeman's claims into those that the district court analyzed under AEDPA and those that the district court reviewed de novo.

### 1. *Claims the District Court Addressed Under AEDPA*

The district court reviewed the claims that it deemed exhausted pursuant to § 2254(d). Specifically, the court reviewed the Alabama courts' rejection on the merits of Freeman's "highly conclusory versions of these same ineffective assistance complaints

during the course of [his] Rule 32 proceedings," and found that Freeman "alleged no specific facts and presented no evidence to the circuit court" in support of the claims. Additionally, the court explained Freeman "failed to allege with any reasonable degree of specificity exactly what new or additional mitigating evidence his trial counsel should have presented" at his trial. As such, the court found that, under the circumstances, the Alabama courts' conclusions regarding Freeman's claims under *Strickland* were neither "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court" nor "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented" in Freeman's state court proceedings. *See* § 2254(d).

On appeal, Freeman fails to make *any* argument that the Alabama Court of Criminal Appeals' denial of Freeman's claim of ineffective assistance of counsel was contrary to or involved an unreasonable application of *Strickland*, or that it was based on an unreasonable determination of the facts in light of the evidence presented in state court. Freeman's argument on appeal is instead directed toward the district court's de novo review of claims presented for the first time in the district court—not the district court's § 2254(d) review of the Alabama state courts' decisions. Thus, Freeman has abandoned the issue on appeal. *See Atkins v. Singletary*, 965 F.2d 952, 955 n.1 (11th Cir. 1992) (holding that a habeas petitioner abandons an issue by failing to address it on appeal).

But, even if we considered the issue, Freeman is not entitled to relief. Under § 2254(d), "the availability of federal habeas relief is limited with respect to claims previously 'adjudicated on the merits' in state-court proceedings." *Harrington*, 562 U.S. at 92 (quoting § 2254(d)). Here, the "last related state-court decision that . . . provide[s] a relevant rationale," *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018), is the Alabama Court of Criminal Appeals' unpublished memorandum decision affirming the judgment of the postconviction court denying Freeman's Rule 32 petition. The appellate court held that Freeman was not entitled to an evidentiary hearing in the postconviction court on his claim of ineffective assistance of counsel because "none of his allegations were pleaded with sufficient specificity to satisfy the requirements in Rule 32.3 and Rule 32.6(b)." *Freeman v. Alabama*, No. CR-02-1971, at 15 (Ala. Crim. App. June 17, 2005). The appellate court further held that:

> Freeman did not allege in his petition what "available evidence" there was about his background or mental health history that his counsel did not present or what "manner" he believes his counsel should have presented the unidentified evidence. Likewise, other than the conclusory allegation that but for counsel's conduct in this regard, there was a reasonable probability that the outcome of his trial would have been different, Freeman alleged no facts tending to indicate that he was prejudiced by counsel's preparation for and conducting of the penalty phase of his trial. His contentions in this regard are vague and conclusory

and wholly insufficient to satisfy his burden of pleading.  Therefore, denial of these allegations of ineffective assistance of trial counsel was proper.

*Id.* at 24–25.

This Court has "held repeatedly that a state court's rejection of a claim under Rule 32.6(b) is a ruling on the merits." *Boyd v. Comm'r, Ala. Dep't of Corr.*, 697 F.3d 1320, 1331 (11th Cir. 2012). Because the Alabama appellate court's decision was on the merits, § 2254(d) applies.

In an ineffective assistance of counsel claim, § 2254(d)'s terms are judged by the standard set forth in *Strickland v. Washington*. *Harrington*, 562 U.S. at 92. "To succeed on an ineffective assistance claim under *Strickland*, Petitioner must show (1) that his trial 'counsel's performance was deficient' and (2) that it 'prejudiced [his] defense.'" *Whatley v. Warden, Ga. Diagnostic & Classification Ctr.*, 927 F.3d 1150, 1175 (11th Cir. 2019) (alteration in original) (quoting *Strickland*, 466 U.S. at 687). And to determine whether Freeman is entitled to habeas relief under § 2254(d), we must ask "(1) whether the [state court] decisions were 'contrary to, or involved an unreasonable application of, clearly established Federal law, as determined' in *Strickland*, or (2) whether the . . . decisions were 'based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.'" *Id.* (citations omitted). "For purposes of § 2254(d)(1), 'an *unreasonable* application of federal law is different from an *incorrect* application of federal law.'" *Harrington*, 562 U.S. at 101 (quoting *Williams*

*v. Taylor*, 529 U.S. 362, 410 (2000)).  Indeed, under AEDPA, "[a] state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself." *Id.*  The standard for habeas relief under AEDPA is "difficult to meet," as the Supreme Court has explained:

> [Section 2254(d)] preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents.  It goes no further. . . .  As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

*Id.* at 102–03.

Here, Freeman's Rule 32 petition, filed in the Alabama state court, alleged the following:

> J. Trial counsel failed to investigate, develop and present available evidence in mitigation of petitioner's punishment. But for counsel's deficient performance, there exists a reasonable probability that the result of petitioner's trial would have been different.

> K. Trial counsel failed to present available evidence regarding petitioner's background and his mental health history to the jury in a manner which would

> have allowed the jury to give this evidence mitigating
> effect during the sentencing phase. But for counsel's
> deficient performance, there exists a reasonable prob-
> ability that the result of petitioner's trial would have
> been different.

In affirming the trial court's denial of Freeman's claim, the appel-
late court found that "none of his allegations were pleaded with
sufficient specificity to satisfy the requirements in Rule 32.3 and
Rule 32.6(b)" and that Freeman's claim of prejudice was "vague
and conclusory and wholly insufficient to satisfy his burden of
pleading." *Freeman*, No. CR-02-1971, at 24–25. As such, the Ala-
bama appellate court concluded that the denial of these allegations
of ineffective assistance of trial counsel was proper.

We agree with the district court's determination under
AEDPA that Freeman has not demonstrated the Alabama courts'
denial of his *Strickland* claims were "contrary to, or involved an
unreasonable application of, clearly established Federal law, as de-
termined by the Supreme Court" or "resulted in a decision that was
based on an unreasonable determination of the facts in light of the
evidence presented" in Freeman's state court proceedings.

Our decision in *Boyd* is instructive. In *Boyd*, Boyd's Rule 32
petition "baldly assert[ed]" his claims of ineffective assistance of
counsel. 697 F.3d at 1332. "Taking these vague and conclusory
allegations together, the Alabama Court of Criminal Appeals deter-
mined that Boyd's claim fell far short, on its face, of establishing
either *Strickland*'s performance or prejudice prong." *Id.* This

Court "agree[d] with the district court that the Alabama court's dismissal of this claim as facially insufficient was neither contrary to nor an unreasonable application of *Strickland*." *Id.* at 1333. This Court explained that "because Boyd's petition completely failed to detail what mitigating evidence should have been developed, and, failed to provide the kind of evidence that may warrant relief under *Strickland*," it could not say that the Alabama appellate court's rejection of this claim was contrary to or an unreasonable application of *Strickland*. *Id.* at 1334.

Similarly, here, given the bald assertions in Freeman's Rule 32 petition, it cannot be said that the Alabama Court of Criminal Appeals' denial of Freeman's claim on the basis that his allegations failed to satisfy his burden of pleading was contrary to or an unreasonable application of *Strickland*.

Accordingly, we affirm the district court's denial of these claims.

### 2. *Claims the District Court Reviewed De Novo*

As explained above, we conclude that Freeman's claim of ineffective assistance of counsel—though based in part on factual allegations presented for the first time in his district court brief on the merits—was exhausted in state court. However, because the district court believed otherwise, it conducted de novo review as to the claim and denied it on the merits. *See* § 2254(b)(2); *LeCroy*, 421 F.3d at 1261 n.26. Because we conclude that Freeman's claim as to the new factual allegations was exhausted here, we review the

claim under AEDPA. And, under AEDPA's highly deferential standard of review, we deny Freeman's claim. *See Frazier v. Bouchard*, 661 F.3d 519, 531 (11th Cir. 2011) ("[W]here the relevant claim implicates *Strickland*, our review is even more deferential.").

Again, to determine whether Freeman is entitled to habeas relief, we must determine "(1) whether the [state court] decisions were 'contrary to, or involved an unreasonable application of, clearly established Federal law, as determined' in *Strickland*, or (2) whether the . . . decisions were 'based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.'" *Whatley*, 927 F.3d at 1175 (citations omitted). Under *Strickland*, a convicted defendant who claims that he was denied effective assistance of counsel is required to show that "counsel's performance was deficient," i.e., "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." 466 U.S. at 687. Additionally, "the defendant must show that the deficient performance prejudiced the defense," which "requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* As to the *Strickland* deficiency prong, "a person challenging a conviction must show that 'counsel's representation fell below an objective standard of reasonableness.'" *Harrington*, 562 U.S. at 104 (quoting *Strickland*, 466 U.S. at 688). "A court considering a claim of ineffective assistance must apply a 'strong presumption' that counsel's representation

was within the 'wide range' of reasonable professional assistance." *Id.* (quoting *Strickland*, 466 U.S. at 689).

Here, the relevant state court decision on the merits of Freeman's claim concluded that Freeman was not entitled to an evidentiary hearing in the postconviction court on his claim of ineffective assistance of counsel because "none of his allegations were pleaded with sufficient specificity to satisfy the requirements in Rule 32.3 and Rule 32.6(b)." *Freeman*, No. CR-02-1971, at *15. In reviewing the state court's decision, our review is limited under AEDPA to "whether the state court's determination that [Freeman] failed to plead sufficient facts in his Rule 32 petition to support a claim of ineffective assistance of counsel was contrary to or an unreasonable application of Supreme Court precedent." *Powell v. Allen*, 602 F.3d 1263, 1273 (11th Cir. 2010). We therefore "look only to the allegations in [Freeman's] Rule 32 petition and whether those allegations sufficiently state a claim for ineffective assistance of counsel." *Id.*; *accord Borden v. Allen*, 646 F.3d 785, 817 (11th Cir. 2011) (explaining that the record under review for purposes of § 2254(d)(1) "is limited to the record that was before the state court that adjudicated the claim on the merits" (quoting *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011))).

Therefore, we must answer two questions to resolve this habeas appeal: (1) whether Freeman's Rule 32 petition "pleaded enough specific facts that, if proven, amount to a valid penalty phase ineffective assistance of counsel claim"; and (2) "if we answer the first question in the affirmative, we must determine whether

the Alabama Court of Criminal Appeals's decision to the contrary was unreasonable under § 2254(d)." *Daniel v. Comm'r, Ala. Dep't of Corr.*, 822 F.3d 1248, 1261 (11th Cir. 2016). As noted above, beyond the bald assertions in Freeman's Rule 32 petition, Freeman failed to plead any factual allegation with sufficient specificity in support of his claim. *See Boyd*, 697 F.3d at 1333–34. And while Freeman now raises additional allegations in support of his claim, "we do not consider such supplemental allegations . . . when reviewing the reasonableness of the state court's resolution of this claim, which was based on the allegations before it," in accordance with AEDPA. *Powell*, 602 F.3d at 1273 n.8; *accord Borden*, 646 F.3d at 816 ("[W]e believe that a review of a state court adjudication on the merits in light of allegations not presented to the state court—for example, by examining additional facts or claims presented for the first time in a petitioner's federal habeas petition—would insufficiently respect the 'historic and still vital relation of mutual respect and common purpose existing between the States and the federal courts.'" (quoting *Williams v. Taylor*, 529 U.S. 420, 436 (2000))).

Accordingly, Freeman has not demonstrated, under AEDPA, that the Alabama courts' denial of his *Strickland* claims was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented" in his state court proceedings.

## IV.    CONCLUSION

For the foregoing reasons, we affirm the district court's denial of Freeman's habeas petition.

**AFFIRMED.**

18-13995    JILL PRYOR, J., Concurring in the judgment    1

JILL PRYOR, Circuit Judge, concurring in the judgment:

David Freeman, born into challenging circumstances and thrust into a nightmarish childhood, committed a nightmarish crime when he was still a teenager. There is no doubt that his lead trial counsel abdicated many of her duties, failing, for example, even to attend the start of the guilt phase of the trial and speaking for fewer than four pages of transcript at the penalty phase in defense of her client's life. After Mr. Freeman's conviction, new lawyers filed a shell of a state postconviction petition, omitting critical details that may have supported Mr. Freeman's claim that his trial counsel were ineffective in failing to investigate and present a case in mitigation of the death penalty. In federal habeas proceedings, Mr. Freeman has for the first time alleged the kind of mitigating circumstances that, if true, could entitle him to habeas relief despite the aggravated crime he committed: extreme physical abuse, sexual abuse, housing instability, neglect, abandonment, severe poverty, and family history of mental health problems, Mr. Freeman included. But at this point, these allegations are, sadly, too little too late.

I write separately because, in my view, the majority opinion "is too long and says too much about too many things unnecessarily." *Green v. Sec'y, Dep't of Corr.*, 28 F.4th 1089, 1160 (11th Cir. 2022) (Jordan, J., dissenting in part and concurring in part). I aim to be brief.

After he was convicted and sentenced to death, Mr. Freeman filed a petition for postconviction relief under Alabama Rule of

2          JILL PRYOR, J., Concurring in the judgment      18-13995

Criminal Procedure 32. In his petition he alleged that his trial counsel had failed to investigate and present a constitutionally adequate case in mitigation of the death penalty. Aside from alleging that counsel failed to unearth and present evidence of his "background" and "mental health history," the petition was completely devoid of factual allegations. The Rule 32 court held an evidentiary hearing anyway, denying relief afterward. On appeal, the Alabama Court of Criminal Appeals concluded that the hearing had been unwarranted. Mr. Freeman had failed to plead his claim with sufficient specificity as required by Alabama Rules of Criminal Procedure 32.3 and 32.6(b), so his petition should have been dismissed at the pleading stage. I agree with the majority opinion that this decision was neither contrary to nor an unreasonable application of clearly established law under the Antiterrorism and Effective Death Penalty Act of 1996.

Fast forward to federal habeas proceedings. In his merits brief, Mr. Freeman specifically alleged, for the first time, the universe of mitigating evidence trial counsel should have uncovered had they conducted a reasonable investigation of Mr. Freeman's background and mental health. The allegations—because, without any evidence to support them, that is all they are—paint a truly tragic portrait of Mr. Freeman's life leading up to the crime. Nonetheless, I must concur in the majority opinion's decision to deny him relief. These allegations were not presented to the state court, and "the record under review [of a state court's decision] is limited to the record in existence at that same time, *i.e.,* the record before

18-13995    JILL PRYOR, J., Concurring in the judgment             3

the state court." *Cullen v. Pinholster*, 563 U.S. 170, 181–82 (2011). So, Mr. Freeman could not rely on new evidence (let alone mere allegations) not in the state court record to argue that federal courts should grant habeas relief.

I would be remiss, however, if I failed to reiterate this: the system failed Mr. Freeman all along the way. No one disputes that Mr. Freeman suffered tremendously as a child and adolescent. At age 18, he committed a horrific crime. Mr. Freeman, on trial for his life, did not seem to get the fair shake the Constitution guarantees: counsel who fulfilled their duty to investigate and present a case in mitigation and the opportunity to have his ineffective assistance of counsel allegations heard postconviction. Now, federal habeas counsel has told us what might have been presented in mitigation of the death penalty. If the allegations are true, it is at least conceivable that a reasonable factfinder would have voted against death. But allegations are not evidence, and now it is far too late.

Respectfully, I concur in the judgment.