[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 23-11759

_____

CHRISTIN BILOTTI,

Petitioner-Appellant,

*versus*

FLORIDA DEPARTMENT OF CORRECTIONS,

Respondent-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 0:22-cv-62068-RAR

_____

Before ROSENBAUM, NEWSOM, and MARCUS, Circuit Judges.

PER CURIAM:

Christin Bilotti was convicted of second-degree murder in Florida state court. After exhausting her appeals, she sought post-conviction relief in Florida. But Florida denied that relief. Then Bilotti filed a federal habeas petition. The district court rejected that claim. We granted a certificate of appealability on two of the claims in Bilotti's federal habeas petition.

First, Bilotti argues that her trial counsel was ineffective for failing to preserve a religion-based challenge to the prosecution's strike of a prospective juror. So we must consider whether the state court reasonably applied *Strickland*[1] in rejecting for lack of prejudice Bilotti's claim that her counsel failed to properly preserve this voir dire issue for appeal.

But as things turn out, even if Bilotti can show prejudice on this claim, she's failed to meet the bar for deficient performance. That's so because at the time of Bilotti's trial, the law was unsettled as to whether, as a categorical matter, *Batson*[2] extends to religion-based exclusions. So we can't say that no reasonably competent counsel, under then-prevailing professional norms, would have failed to preserve this *Batson* claim for appeal.

To be sure, the certificate of appealability did not expressly mention the deficient-performance aspect of Bilotti's claim when it noted the prejudice issue. But the district court ruled in the

---

[1] *Strickland v. Washington*, 466 U.S. 668 (1984).

[2] *Batson v. Kentucky*, 476 U.S. 79 (1986).

alternative on the deficient-performance issue, and in any case, certificates of appealability do not limit our obligation to consider whether other parts of the governing legal analysis would necessarily cause a claim to fail on the record before us. Here, Bilotti's failure to show deficient performance means she cannot prevail on her *Strickland* claim, even if she can show prejudice.

Second, Bilotti asserts that her trial counsel was ineffective for failing to object to the court's second-degree murder and "principal" jury instructions. To show both deficiency and prejudice under *Strickland* here, Bilotti must first establish that the jury instructions were erroneous. So the second issue we consider concerns whether the state court reasonably found that Bilotti failed to show that the jury instructions were erroneous when it rejected her claim about trial counsel's failure to object to them.

This claim fails, too. The state trial court used second-degree murder and "principal" instructions that were substantively identical to Florida's standard jury instructions. And Florida's highest court has repeatedly said that trial counsel can't be deficient for failing to object to standard jury instructions, when the Supreme Court of Florida has not yet invalidated them. As the propriety of state-court jury instructions presents an issue of state law, we must defer to the Florida courts. Because Bilotti can't show that these instructions were likely erroneous under Florida law, she hasn't established that her counsel performed deficiently in failing to object to their use. Nor has she shown prejudice because her argument was unlikely to prevail in the state courts on appeal.

For these reasons, we affirm the district court's judgment.

## I.     BACKGROUND

A Florida jury indicted Christin Bilotti, her father Michael Bilotti, his friend John Pacchiana, and two others on charges of first-degree murder and conspiracy to commit first-degree murder, for the 2005 killing of Richard Rojas. Bilotti was seventeen years old at the time.

The evidence at trial established that Bilotti told her father that Rojas—her on-again, off-again boyfriend—had raped her. Bilotti's father asked his friends to come over, and they discussed finding Rojas. After Bilotti, Rojas, Bilotti's father, and his friends convened at Bilotti's mother's house, Pacchiana shot and killed Rojas. At trial, the state urged the theory that Bilotti lured Rojas to her mother's house, knowing that Pacchiana intended to kill him.

The jury convicted Bilotti of the lesser-included crime of second-degree murder on Count I, and it returned a not-guilty verdict on the conspiracy count. The trial court sentenced Bilotti to 30 years' imprisonment, plus two years on community control and eight years of probation.

Bilotti raised a few issues on appeal. But we discuss only those matters relevant to the *Batson* and jury-instruction ineffective-assistance claims before us now.

### A.  *Voir Dire*

During jury selection, the state used a peremptory challenge to strike a Black Jehovah's Witness prospective juror ("Juror").

After defense counsel asked for "a race neutral reason" for the strike, the prosecutor responded that it "gives [him] pause" that the Juror is a Jehovah's Witness because "they've always said they can't sit in judgment." Defense counsel replied, "That's a religious based strike." The court then asked the Juror directly how her religion may affect her ability to be fair and impartial. She said that she could make a decision fairly based on the evidence at trial, but that she may be unable to sit impartially at the sentencing.

The court then heard counsels' arguments about the state's attempt to strike the Juror. Defense counsel once again objected, this time asking for "a race neutral reason" for the strike; and the court overruled the race-based objection. The court found that the Juror was excluded for a non-race-based reason—her religion—and denied the challenge. But the court noted that the defense's challenge to the Juror was "preserved."

Five days later, before the jury was sworn in, defense counsel moved for a mistrial and to select a new jury, now invoking a religion-based objection to the Juror's exclusion. The trial court declined to extend *Batson* to religion but said that "all of [defense counsel's] objections are . . . preserved at this time."

B. *Jury Instructions*

The next critical moment, for our purposes, occurred at the jury-instructions phase of the trial. In charging the jury, the court described the elements of the second-degree murder charge as follows:

First, that Mr. Rojas is dead.

Second, the death was caused by the criminal act or acts of Michael Bilotti, Christin Bilotti, and John Pacchiana.

And, Third, there was an unlawful killing of Richard Rojas by an act imminently dangerous to another and demonstrating a depraved mind without regard for human life.

An "act" includes a series of related actions arising from and performed pursuant to a single design or purpose.

An act is "imminently dangerous to another and demonstrating a depraved mind" if it is an act or series of acts that:

One, a person of ordinary judgment would know is reasonably certain to kill or do serious bodily injury to another; and,

Two, is done from ill will, hatred, spite, or an evil intent; and,

Three, is of such a nature that the act itself indicates an indifference to human life.

*In order to convict of second degree murder, it is not necessary for the State to prove the defendants had an intent to cause death.*

Trial Tr. at 4549–50, Doc. 9-3 (emphasis added).

23-11759                Opinion of the Court                7

Besides the offense instructions, the court also gave the following "principal" instruction, which applied to Count I:

> If a defendant helped another person or persons commit or attempt to commit a crime, the defendant is a principal and must be treated as if they had done all the things the other person or persons did if:

> *One, the defendant had a conscious intent that the criminal act be done*; and, Two, the defendant did some act or said some word which was intended to and which did incite, cause, encourage, assist, or advise the other person or persons to actually commit or attempt to commit the crime.

> To be a principal, the defendant does not have to be present when the crime is committed or attempted.

*Id.* at 4555–56 (emphasis added).

Defense counsel did not object to these instructions.

*C.  Direct Appeal*

On direct appeal, the Florida intermediate appellate court at first reversed the second-degree murder conviction. *Bilotti v. State*, 238 So. 3d 827, 827 (Fla. Dist. Ct. App. 2018), *review granted, decision quashed*, No. SC18-673, 2020 WL 2617044 (Fla. May 22, 2020). It did so, it explained, "for all the reasons stated in" Pacchiana's appeal. *Id.* (citing *Pacchiana v. State*, 240 So. 3d 803, 805 (Fla. Dist. Ct. App. 2018) ("Fourth DCA Case"), *decision quashed*, 289 So. 3d 857 (Fla. 2020)). Pacchiana, as we've noted, was one of Bilotti's codefendants who also argued that the state's peremptory strike

violated *Batson v. Kentucky*, 476 U.S. 79 (1986). The Fourth DCA agreed, concluding the state's strike was pretextual, improper as a religion-based strike, and an "impermissible 'religious test' in violation of the United States and Florida Constitutions." *Pacchiana*, 240 So. 3d at 805; *see also id.* at 810–16. Based on these findings, the Fourth DCA reversed Pacchiana's and Bilotti's convictions and remanded for a new trial. *Id.* at 816; *Bilotti*, 238 So. 3d at 827.

The Supreme Court of Florida then quashed the Fourth DCA's decision, as applied to both Pacchiana and Bilotti. *Bilotti*, 2020 WL 2617044, at *1; *State v. Pacchiana*, 289 So. 3d 857 (Fla. 2020). The state's highest court did not reach the issue of the religion-based *Batson* challenge on the merits, instead finding that the two petitioners had failed to properly preserve it at trial. *Pacchiana*, 289 So. 3d at 858. The Supreme Court of Florida determined the objection was "unpreserved" because Florida law requires both (1) a contemporaneous objection to a strike and (2) the renewal of that objection before the court swears in the jury. *Id.* at 861. But here, defense counsel failed to assert a religion-based contemporaneous objection, so the issue wasn't preserved; and the court concluded it couldn't consider the issue any further. *Id.* at 862. On remand, the Fourth DCA affirmed Bilotti's conviction and sentence in accordance with the Florida Supreme Court's ruling. *Bilotti v. State*, 298 So. 3d 659, 660 (Fla. Dist. Ct. App. 2020) (per curiam).

### D. State Postconviction Proceedings

Bilotti then initiated state postconviction proceedings. Two issues she raised are relevant here. We summarize each of them, along with the parties' arguments, because the state postconviction trial court adopted the state's arguments as the bases for its denial of Bilotti's claims.

First, Bilotti argued that trial counsel was ineffective in failing to properly preserve the religion-based *Batson* challenge, and if counsel had preserved it, she would've won on appeal. Bilotti asserted that in assessing prejudice for an unpreserved claim, we should look to the effect of the error on her direct appeal, citing *Davis v. Secretary for the Department of Corrections*, 341 F.3d 1310 (11th Cir. 2003) (per curiam). And if we do that here, she continued, we know that she suffered prejudice because this claim at first *did* prevail on appeal. *See Pacchiana*, 240 So. 3d at 805, 816.

And second, Bilotti contended that defense counsel was ineffective for failing to object to the second-degree-murder jury instructions and that she'd suffered prejudice as a result. As to counsel's performance, Bilotti asserted that the instructions the court gave on the intent requirement—which provided that "it is not necessary for the State to prove the defendants had an intent to cause death," and that she had to have had "a conscious intent that the criminal act be done"—were erroneous.

In Bilotti's view, these instructions conflicted with the way that a Florida appellate court described the elements for a second-degree-murder conviction on a principals theory in *Hedgeman v.*

*State*, 661 So. 2d 87, 88 (Fla. Dist. Ct. App. 1995). *Hedgeman* was a sufficiency-of-the-evidence case. *See id.* The court there said that "to establish that Hedgeman was a principal to the crime committed by another, the state had to prove that Hedgeman *intended the crime be committed* and did some act to assist the other person in actually committing the crime." *Id.* (emphasis added). But given a lack of evidence that the defendant "knew that [the killer] intended to kill the victim," and "[a]bsent any testimony to establish that [the killer] planned to kill the victim that night and that Hedgeman knew of his plans," the court determined that the state had not proven that "Hedgeman intended that the crime be committed." *Id.* As a result, the court reasoned, the evidence was insufficient to convict Hedgeman, on a principal theory, of second-degree murder. *Id.* at 89. Bilotti argues that the court's instruction that the state did not have to prove that "the defendants had an intent to cause [Rojas's] death" conflicts with *Hedgeman*.

As for prejudice, Bilotti pointed to a juror's email to the judge after trial, noting that the juror had had trouble convicting Bilotti. As the juror explained her conflict, she "felt that . . . [Bilotti] did not mean for [Rojas] to be killed." Bilotti asserted that this shows the jury misunderstood the required mens rea to convict her of second-degree murder as a principal.

The state countered Bilotti's arguments on these issues. On the voir dire claim, the state urged that, to show prejudice under *Strickland*, Bilotti had to establish that "a biased juror actually served on the jury." *See Jenkins v. State*, 824 So. 2d 977, 982 (Fla.

Dist. Ct. App. 2002).  Not only that, the state said, but Bilotti's reliance on *Davis* was "without merit."  In the state's view, *Davis* is narrow, and the Florida Supreme Court expressly rejected *Davis* and its reasoning in *Carratelli v. State*, 961 So. 2d 312 (Fla. 2007).  So the state postconviction court shouldn't look to the effect of counsel's alleged error on Bilotti's appeal, the state argued.

Rather, the state asserted that *Carratelli* and *King v. State*, 211 So. 3d 866, 887–88 (Fla. 2017) (per curiam), controlled.  These decisions reiterated that "when considering the failure to preserve a challenge to potential jurors in voir dire, the reviewing court should focus on the defendant's trial, not his appeal" in assessing prejudice.  *Id.* at 887.  And they explained that, "[u]nder such circumstances, . . . a defendant must show that a biased juror served during the defendant's trial to satisfy *Strickland*'s [prejudice] requirement."  *Id.*  Based on these cases, the state argued that the state postconviction court should deny Bilotti's claim because she hadn't shown that a biased juror sat on her jury.  On this voir dire issue, the state was silent on *Strickland*'s deficient-performance prong.

As for Bilotti's jury-instructions claim, the state described Bilotti's reliance on *Hedgeman* as "misplaced."  As the state saw things, the *Hedgeman* court "reversed the conviction based on insufficient evidence, not on an erroneous jury instruction."  And unlike in *Hedgeman*, the state continued, the state court here had found on direct appeal that sufficient evidence supported Bilotti's conviction.

The state postconviction court denied Bilotti's petition. It stated simply that it "adopt[ed] the reasoning as set forth in the response of the State, which contains a thorough recital of the relevant issues and law." *State v. Bilotti*, No. 08-3720CF10B, 2021 Fla. Cir. LEXIS 12698, at *1 (Fla. Cir. Ct. Nov. 15, 2021). When Bilotti appealed, the state postconviction appellate court affirmed per curiam, without explaining its reasons. *Bilotti v. State*, 345 So. 3d 1284 (Fla. Dist. Ct. App. 2022) (per curiam). So the most recent explanation we have from the state courts for their denial of Bilotti's *Strickland* claims comes from the state trial court's rejection of her petition, based on the reasons that the state's response to Bilotti's petition set forth.

This matters to the review we must conduct under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. 104–132, 110 Stat. 1214. After all, when the state court does not explain its reasoning, we must "'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale," "presum[ing] that the unexplained decision adopted the same reasoning." *Wilson v. Sellers*, 584 U.S. 122, 125 (2018).

### E. Federal Habeas Petition

Bilotti next filed her Section 2254 petition. The district court denied her petition, adopting the reasons that the magistrate judge's report and recommendation ("R&R") set forth.

The R&R found that the state courts reasonably applied *Strickland* when they rejected Bilotti's claims. For the voir dire

claim, the R&R concluded that the state courts were "bound to follow" *King* and *Carratelli* when they required Bilotti to show that a biased juror sat on her jury, to prevail on the prejudice prong. And the R&R distinguished *Davis*'s decision to look to the effect on appeal because it was an AEDPA case that applied de novo review— not AEDPA deference—since the state courts in Davis's case didn't opine on the merits of the *Strickland* claim there. And because *Davis* isn't clearly established Supreme Court law, the R&R reasoned, Bilotti cannot rely on it under AEDPA. So the R&R determined that Bilotti failed to establish prejudice. The R&R added that Bilotti would lose on deficient-performance grounds, too. As the R&R reasoned, counsel couldn't have performed below an objectively reasonable standard because three Florida appellate judges thought counsel *had* adequately preserved the religion-based objection.

On the jury-instructions claim, the R&R again recommended denying Bilotti's petition. Noting that the trial court's instructions to the jury were identical to Florida's standard jury instructions, the R&R reasoned that they weren't erroneous. The R&R also rejected Bilotti's argument that *Hedgeman* showed that the instructions were erroneous. In the magistrate judge's view, *Hedgeman* could be reconciled with the standard jury instructions because second-degree murder is a general-intent crime, so all the state needs to show is a "conscious intent to participate in a depraved-mind act." R&R at 30–32, Doc. 12 (quoting *Jamerson v. State*, 677 So. 2d 1299, 1301 (Fla. Dist. Ct. App. 1996) (per curiam) (Pariente, J., dissenting)). And because the R&R determined that

the jury instructions weren't erroneous, it likewise concluded that Bilotti's counsel wasn't deficient in failing to object to their use and that the instructions didn't prejudice Bilotti.

The district court agreed with the R&R in full, denying Bilotti's petition.

We granted a certificate of appealability on two issues:

(1) Whether, in denying Bilotti's claim that trial counsel failed to properly preserve an issue for appeal, related to the state's allegedly improper use of a peremptory strike to remove a potential juror from the venire, the state court reasonably applied *Strickland v. Washington*, 466 U.S. 668 (1984), in concluding that she could not establish prejudice?; and

(2) Whether, in rejecting Bilotti's claim that trial counsel failed to object to the jury instructions, the state court reasonably found that she did not demonstrate that the jury instructions were erroneous?

## II.    DISCUSSION

On a Section 2254(d) petition, we review de novo the district court's conclusions on legal issues and mixed questions of law and fact. *Terrell v. GDCP Warden*, 744 F.3d 1255, 1261 (11th Cir. 2014). We review for clear error the district court's factual findings. *Id.*

### A. Legal Standard

AEDPA "imposes a highly deferential standard for reviewing the state court rulings on the merits of constitutional claims raised by a petitioner." *Id.* Under Section 2254(d), federal courts

may grant habeas relief only if the claim either "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

Bilotti brings claims under Section 2254(d)(1).  Under that section, "contrary to" and "unreasonable application" set high bars for relief (or low bars for the state courts).  As we've explained,

> The phrase "contrary to" means that the state court decision applied a rule that contradicts the governing law set forth by the United States Supreme Court, or when faced with materially indistinguishable facts, it arrived at a result that differs from Supreme Court precedent.  An "unreasonable application" of clearly established federal law occurs when "the state court correctly identifies the governing legal principle . . . but unreasonably applies it to the facts of the particular case."

*Terrell*, 744 F.3d at 1261 (quoting *Bell v. Cone*, 535 U.S. 685, 694 (2002)) (other citations omitted).

And the Supreme Court has clarified that an "unreasonable" application of the law requires more than a merely "incorrect" application of it.  *See Williams v. Taylor*, 529 U.S. 362, 410 (2000).  So long as "some fairminded jurists could agree with the state court's decision," we must deny habeas relief.  *Loggins v. Thomas*, 654 F.3d

1204, 1220 (11th Cir. 2011). Put simply, AEDPA imposes a "highly deferential" standard of review. *Renico v. Lett*, 559 U.S. 766, 773 (2010) (citation and internal quotation marks omitted).

That said, AEDPA's deferential review applies only if the state court adjudicated the claim on the merits. But if no state court did so, then AEDPA's deferential standard of review doesn't apply, and we review the claim de novo. *Reaves v. Sec'y, Fla. Dep't of Corr.*, 872 F.3d 1137, 1151 (11th Cir. 2017).

Like AEDPA, *Strickland*, too, is deferential. The test looks for (1) counsel's deficient performance and (2) prejudice. To show deficient performance, the movant must establish "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687–88. That is, counsel's performance must have fallen below "an objective standard of reasonableness," under "prevailing professional norms." *Id.* So when it comes to counsel's performance, *Strickland* and AEDPA "combine to produce a doubly deferential form of review that asks only 'whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.'" *Gissendaner v. Seaboldt*, 735 F.3d 1311, 1323 (11th Cir. 2013) (quoting *Harrington v. Richter*, 562 U.S. 86, 105 (2011)). Our job "is not to point out counsel's errors, but to determine whether counsel's performance was below prevailing professional norms to such an extent that the defendant was denied [the] Sixth Amendment right to the assistance of counsel." *Nelson v. Nagle*, 995 F.2d 1549, 1554 (11th Cir. 1993) (per curiam). And "because counsel's

conduct is presumed reasonable, for a petitioner to show that the conduct was unreasonable, a movant must establish that no competent counsel would have taken the action that his counsel did take." *Chandler v. United States*, 218 F.3d 1305, 1315 (11th Cir. 2000) (en banc).

As far as prejudice goes, the movant must show that counsel's errors were "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687. Indeed, the movant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

Finally, we need not address both prongs of the *Strickland* inquiry if a petitioner fails to satisfy one. *See Terrell*, 744 F.3d at 1262. Given AEDPA and *Strickland*'s high bar, "it is a rare case in which a petitioner obtains federal habeas relief on an ineffective assistance of counsel claim that the state court denied on the merits." *Id.*; *see also Nance v. Warden, Ga. Diagnostic Prison*, 922 F.3d 1298, 1301 (11th Cir. 2019) (acknowledging how "difficult" this "stringent standard" is).

Bilotti has not met this bar here.

B. *Even if she suffered prejudice, Bilotti has failed to show deficient performance on her voir dire claim.*

Bilotti asks us to review her voir dire claim de novo. She asserts that the state courts unreasonably applied *Strickland*'s

18                    Opinion of the Court                    23-11759

prejudice prong in requiring her to show that a biased juror sat on her jury.  If we were to review the claim de novo, Bilotti argues, we should apply *Davis* and find the prejudice prong satisfied.  After all, Bilotti urges, but for her counsel's alleged error, she would've won on appeal.

Our recent precedent might support Bilotti's claim.  In *Guardado v. Secretary, Florida Department of Corrections*, we held that Florida's requirement for a petitioner to show that a biased juror sat on her jury unreasonably applies *Strickland*'s prejudice prong. *See* 112 F.4th 958, 990–94 (2024).  We reached that decision because *Carratelli*'s "heightened actual bias test" imposes a more stringent standard than *Strickland*'s "reasonable probability test," which is "more lenient[.]"  *Id.* at 990–91.  So we said that *Carratelli* unreasonably applied *Strickland*.  *Id.* at 991–95.  For that reason, we concluded we didn't owe any deference to the state court's determination under AEDPA.  *Id.* at 992 (citing *Calhoun v. Warden, Baldwin State Prison*, 92 F.4th 1338, 1347–49 (11th Cir.), *cert. denied sub nom. Calhoun v. Warden*, 145 S. Ct. 443 (2024); *Debruce v. Comm'r, Ala. Dep't of Corr.*, 758 F.3d 1263, 1266 (11th Cir. 2014)).

Assuming *Guardado* governs,[3] we'd conclude that the state court unreasonably applied *Strickland*'s prejudice prong to Bilotti's

---

[3] The posture of the case in *Guardado* differed from the posture of Bilotti's case. For instance, *Guardado* involved an ineffective-assistance claim where counsel failed to challenge or peremptorily strike certain allegedly biased jurors, *see Guardado*, 112 F.4th at 981, and not a failure to *preserve* a challenge to a particular juror, *id.* at 990 n.3.  *Guardado* also arose in the context of voir dire during the penalty phase of a capital trial, *id.* at 966, so the relevant prejudice standard

23-11759                Opinion of the Court                19

case, the same way it did to Guardado's: by holding Bilotti to a higher standard than *Strickland* allows. So we'd review the prejudice prong de novo for the voir dire claim. *See Calhoun*, 92 F.4th at 1347–49; *Debruce*, 758 F.3d at 1266. In doing so, we'd apply *Davis* and find that Bilotti has established prejudice here. That is, a reasonable probability exists that, but for counsel's failure to preserve the religion-based objection, the outcome on appeal would have been different. In fact, it's more than a reasonable probability because we *know* the outcome would've been different. Indeed, the Fourth DCA originally ruled in Bilotti's favor on the religion-based *Batson* challenge. *Pacchiana*, 240 So. 3d at 805; *see also Herring v. Sec'y, Dep't of Corr.*, 397 F.3d 1338, 1354–55 (11th Cir. 2005) (observing that where a Florida court "already has told us how the issues would have been resolved under Florida state law," "[i]t is a 'fundamental principle that state courts are the final arbiters of state law, and federal habeas courts should not second-guess them on such matters'" (citation omitted)).

But even if Bilotti can prevail on the prejudice prong, she has failed to establish that her counsel was unconstitutionally deficient.

----

there was "whether the petitioner has shown 'a reasonable probability that, absent [counsel's] errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death,'" *id.* at 990 (citation omitted). Still, as we explained in *Guardado*, these differences were seemingly immaterial to the Court's analysis of the *Carratelli* framework, because *Carratelli* "set out a unified prejudice standard for claims of ineffective assistance in 'failing to preserve *or raise* a cause challenge before a jury is sworn.'" *Id.* at 990 n.3 (quoting *Carratelli*, 961 So. 2d at 327).

From the start, we must reject Bilotti's assertion that considering the district court's alternative holding that Bilotti's *Strickland* claim fails on the deficiency prong extends beyond the scope of the certificate of appealability ("COA"). To be sure, we generally review only the issues that the certificate of appealability specifies. *Freeman v. Comm'r, Alabama Dep't of Corr.*, 46 F.4th 1193, 1215 (11th Cir. 2022). That said, we "construe the issue specified in the COA 'in light of the pleadings and other parts of the record.'" *Id.* (quoting *Murray v. United States*, 145 F.3d 1249, 1251 (11th Cir. 1998) (per curiam)); *cf. id.* (adding that we also construe the COA "to encompass any issue that 'must be resolved before reaching the merits' of a claim identified in the COA" (citation omitted)).

Certificates of appealability don't somehow alter the normal rule that "we may affirm on any ground the record supports." *See Santos v. United States*, 982 F.3d 1303, 1309 n.3 (11th Cir. 2020). The statute providing for certificates of appealability, 28 U.S.C. § 2253, does not suggest otherwise. In relevant part, the statute provides that a litigant may not appeal "the final order" in a Section 2255 proceeding "[u]nless a circuit justice or judge issues a certificate of appealability[.]" 28 U.S.C. § 2253(c)(1). Then the statute sets forth the requirements for COAs, which "may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." *Id.* § 2253(c)(2). And the COA "shall indicate which specific issue or issues satisfy the showing required by paragraph (2)." *Id.* § 2253(c)(3).

This text limits only what a movant may appeal, not what the court may consider. Indeed, none of this language purports to suggest that we can't affirm on any alternative ground that the record supports. Once a specific ground for appeal is before us, we may decide the case like any other appeal.[4]

That's especially so in a case like this one, where the district court made an alternative holding denying relief on the claim. Indeed, when the district court denied Bilotti's Juror-related *Strickland* claim, it alternatively reasoned that counsel had not performed deficiently. And we've explained that, "[t]o obtain reversal of a district court judgment that is based on multiple, independent grounds, an appellant must convince us that every stated ground

---

[4] The U.S. Supreme Court appears to have suggested as much in *Jennings v. Stephens*, 574 U.S. 271 (2015). In *Jennings*, a habeas petitioner had obtained relief in the district court on two of his original three theories of ineffective assistance. *Id.* at 273. On appeal, the petitioner attempted to defend the district court's judgment on all three grounds. *Id.* The Court considered whether he needed to first obtain a COA to argue the third theory, which the district court had rejected below. *Id.* It concluded that the petitioner did not. *Id.* at 282. As the Court explained, the requirement for the petitioner to obtain a certificate of appealability, by the plain text of Section 2253(c), "does not embrace the defense of a judgment on alternative grounds." *See id.* at 282–83. In other words, Section 2253(c) does not require the petitioner, when defending the judgment below, to obtain a COA to make an alternative-grounds argument when the record supports it. *See id.*; *see also id.* at 279 (stating, in explaining that the petitioner needn't obtain a cross-appeal either to advance this theory, that "even a successful applicant . . . defending his judgment on appeal is confined to those alternative grounds present *in the record*" (emphasis in original)). The same reasoning applies here, only more so, given that the district court alternatively held that Bilotti failed to establish deficient performance.

for the judgment against him is incorrect." *Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 680 (11th Cir. 2014).

For her part, Bilotti recognized her burden to establish both prongs of her *Strickland* claim on appeal, despite the COA's focus on *Strickland*'s prejudice prong. *See Tuomi v. Sec'y, Fla. Dep't of Corr.*, 980 F.3d 787, 795 (11th Cir. 2020) (noting that the movant bears the burden at all times to show "*both* that (1) [her] counsel's performance was deficient; *and* (2) the deficient performance prejudiced [her] defense" (emphases added)). And she briefed and argued the deficient-performance issue. As we've explained, "[f]ailure to establish either [*Strickland*] prong is fatal and makes it unnecessary to consider the other." *Id.*

For this reason, even "when a state court's decision on an ineffective assistance claim clearly rests on only one prong of the *Strickland* test, we conduct a plenary review of the other one, if necessary." *See, e.g.*, *Reaves*, 872 F.3d at 1151; *see also Tuomi*, 980 F.3d at 795. So we consider the deficient-performance issue for this claim, even though the certificate of appealability expressly discussed only the prejudice prong.

As we've noted, the state court made no findings on the merits of the deficient-performance prong. So we review that issue de novo. *Reaves*, 872 F.3d 1137, 1151.

In conducting our review, we keep in mind that when the law was "unsettled" at the time of counsel's challenged action, we don't generally find that counsel rendered constitutionally ineffective assistance. *See Jones v. United States*, 224 F.3d 1251, 1258 (11th

23-11759                Opinion of the Court                23

Cir. 2000).  To the contrary, we've repeatedly stated that effective assistance of counsel does not require counsel to predict how the law might develop.  *See Sullivan v. Wainwright*, 695 F.2d 1306, 1309 (11th Cir. 1983); *Spaziano v. Singletary*, 36 F.3d 1028, 1039 (11th Cir. 1994).

And that's exactly the problem for Bilotti here.  To be sure, Bilotti points to two Florida appellate decisions suggesting that counsel should have been on notice that the state's religion-based use of a peremptory challenge could have been unconstitutional. But as we explain, these two cases did not settle the law in Florida for purposes of a deficient-performance inquiry under *Strickland*.

The first case explains that *Batson*-like challenges can be "properly applied" outside the context of race-based exclusions alone.  *See Joseph v. State*, 636 So. 2d 777, 779 (Fla. Dist. Ct. App. 1994).  The court there found that excluding a venireperson from the jury for being Jewish was unconstitutional.  *Id.* at 780–71.  The second case Bilotti relies on found constitutional error when a prospective juror was excluded "either" because of his Pakistani ethnicity or his Muslim beliefs.  *See Olibrices v. State*, 929 So. 2d 1176, 1180 (Fla. Dist. Ct. App. 2006).[5]

To understand why these cases didn't establish that religion-based strikes violate the Sixth Amendment or the Florida

---

[5] Bilotti also cites a Minnesota case involving the exclusion of a Jehovah's Witness during voir dire.  *See State v. Davis*, 504 N.W.2d 767, 772 (Minn. 1993). But of course, a Minnesota case could not settle the law in Florida.

constitution, we recount the line of Florida cases applying *Batson* and Florida's state constitutional *Batson* analogs: *State v. Neil*, 457 So. 2d 481 (Fla. 1984), and *State v. Slappy*, 522 So. 2d 18 (Fla. 1988). Like a *Batson* challenge, a *"Neil-Slappy* objection" alleges that the opposing party struck a prospective juror from the venire solely because of her race. *See Jones v. State*, 923 So. 2d 486, 490 (Fla. 2006). The Florida Supreme Court has been clear that it addresses the applicability of *Neil-Slappy* to "other groups . . . *as such cases ar[i]se."* *State v. Alen*, 616 So. 2d 452, 454 (Fla. 1993) (emphasis added). Indeed, *Joseph* itself stated as much. *See* 636 So. 2d at 779 ("While *Neil* involved racial discrimination, the [Florida] Supreme Court recognized that discrimination could be based upon other factors, such as religious, ethnic, and sexual differences, and specifically stated that '[t]he applicability [of this decision] to other groups will be left open and will be determined as such cases arise.'" (quoting *Neil,* 457 So. 2d at 487)).

By the time of Bilotti's trial, the Supreme Court of Florida had extended *Neil-Slappy* violations to exclusions based on a prospective juror's race, gender, and ethnicity. *See Dorsey v. State*, 868 So. 2d 1192, 1202 n.8 (Fla. 2003) (collecting cases). But the Florida Supreme Court explained that it had "not extended *Neil*'s protections beyond" those groups—such as to any "other economic, social, *religious*, political, or geographic group . . . ." *Id.* (emphasis added). *Neil* prohibited peremptory strikes based on race alone. 457 So. 2d at 482. *Alen* did so based on Hispanic ethnicity. 616 So. 2d at 454. And Florida explicitly added gender to the list in *Abshire v. State*, 642 So. 2d 542, 544 (Fla. 1994).

But neither *Olibrices* nor *Joseph* clearly added religion as a category, full stop. Rather, both cases dealt with the exclusion of prospective jurors from the venire for apparently dual ethnicity- and religion-based reasons.

We consider *Olibrices* first. There, the Fourth DCA determined that *Neil-Slappy* covered Pakistani Muslims as a class because the state had "excluded [the juror] because of his ethnicity." 929 So. 2d at 1180. Rather than categorically including religion as a qualifying classification, the court explained that "*Dorsey*'s disclaimer of any holding applying *Neil Slappy* equally to *the singular classification of religion* does not yield the conclusion that the principle may not be applied where a common religious heritage *is also involved* in the shared identity of a given ethnic group." *Id.* at 1178 (emphases added). In other words, the court reasoned that just because the Florida Supreme Court had expressly recognized in *Dorsey* that it had not extended *Neil-Slappy* to religion as a category, this did not preclude the Fourth DCA from applying *Neil-Slappy* when the state struck the juror because of his ethnicity *and* his religion. Indeed, the court explained that the Pakistani Muslim population's "culture, language, history and—yes—its religion, make it objectively and discernibly large, distinct and homogeneous enough to be deemed an *ethnic* group capable of identification." *Id.* at 1179 (emphasis added). For that reason, the court continued, "it was error for the trial judge to conclude that *no ethnicity* violation could be shown because Pakistanis are not recognizable as an *ethnic group* under *Neil Slappy*." *Id.* at 1180 (emphases added).

True, the court mentioned religion in its analysis. And the court said that "whether the juror was challenged because he is of Pakistani origin or because his religious belief is Muslim, it would be a *Neil Slappy* violation to exercise a peremptory challenge of him on either account." *Id.* But in context, it's clear that the court so held based on its conclusion that Pakistani Muslims were a "recognizable . . . *ethnic* group under *Neil Slappy.*" *Id.* (emphasis added). In fact, the Fourth DCA was careful to thread the needle between the Florida Supreme Court's failure at that time to recognize religion as a categorical basis for prohibited juror strikes and its recognition of ethnicity as an acknowledged basis for prohibited juror strikes. So it certainly wouldn't have been objectively unreasonable for a competent attorney to read *Olibrices* as not supporting a challenge to the striking of a juror solely because the potential juror was a Jehovah's Witness.

The Third DCA threaded the needle the same way in *Joseph*. It started by noting that it addressed only "the *narrow question*" of whether "Jews constitute a cognizable class under *Alen* . . . ." 636 So. 2d at 780 (emphasis added). In concluding they do, the court determined that Jews meet the Florida Supreme Court's definition of a "cognizable class," which, the court said, "applies only to *ethnic* groups." *See id.* at 780 & n.2 (emphasis added). That definition requires satisfaction of a two-part test under *Alen*: (1) "the group's population is large enough that the general community recognizes it as an identifiable group," and (2) the group is "internal[ly] cohesive." *Id.* at 780. As the court explained, the Jewish population in Dade County, from which the venire panel was drawn, comprised

about 10% of the population, making it "large enough that the general community recognizes it as an identifiable group." *Id.* Plus, Jews' shared religious customs and persecution established their "internal cohesiveness . . . ." *Id.*

Like *Olibrices*, *Joseph* did not establish that religion-based strikes categorically violate Florida's constitution (or the U.S. Constitution, for that matter). Rather, *Joseph* added to the list of Florida cases that confirmed that Florida addressed *Batson*-type challenges to peremptory strikes on a case-by-case basis. *See Alen*, 616 So. 2d at 454; *Joseph* 636 So. 2d at 779. (And *Joseph* did not consider federal law at all. *See Joseph*, 636 So. 2d at 781 ("We are careful to point out that our decision is grounded upon principles of state constitutional law. . . . [W]e do not analyze this issue under the federal constitution or caselaw.")).

That brings us to *Pacchiana*, which as we've noted, involved Bilotti's codefendant. When the Fourth DCA addressed the question of whether *Batson* covers Jehovah's Witnesses, it discussed *Joseph* and *Olibrices*. *Pacchiana*, 240 So. 3d at 813–14. The court observed that each case found the respective group member protected because they were members of a "cognizable class" that met the two-prong *Alen* test. *Id.* Then the court concluded that members of the Jehovah's Witnesses also met that test. *See id.*

In its discussion, the court characterized *Olibrices* as having held that "striking a potential juror due to his or her religious faith is unconstitutional." *Id.* at 814. But as we've explained, that's not quite accurate. *Olibrices* and *Joseph* found the strikes there to violate

Florida law because the stricken jurors were members of an "ethnic" group. To be sure, the jurors' religious affiliations made or assisted in making them members of an ethnic group. But the point is, both *Olibrices* and *Joseph* studiously avoided holding that strikes based on religion as religion necessarily violated the law.

In hindsight, extending the logic of *Olibrices* and *Joseph* to cover Jehovah's Witnesses like the Juror in Bilotti's case might seem obvious. But that's not the standard for deficiency under *Strickland*. The test is not "whether the best criminal defense attorneys might have done more," but "whether some reasonable attorney could have acted, in the circumstances, as [this attorney] did . . . ." *Waters v. Thomas*, 46 F.3d 1506, 1518 (11th Cir. 1995) (en banc). For the same reason, it's also "not enough" for petitioners to assert simply that their counsel "was ignorant" of state law; rather, petitioners must show that their counsel took an approach that "would not have been used by professionally competent counsel." *Harich v. Dugger*, 844 F.2d 1464, 1470 (11th Cir. 1988) (en banc). This is a high bar.

Here, at the time of Bilotti's trial, Florida had no established rule that *Batson* categorically extends to religion-based exclusions. Nor had any Florida court found a *Batson* violation for the exclusion of a Jehovah's Witness during voir dire.[6] As we've explained,

---

[6] *Cf. French v. Warden, Wilcox State Prison*, 790 F.3d 1259, 1268–69 (11th Cir. 2015) (finding deficient performance where counsel "decided to introduce" some evidence yet failed to "follow the clearly-established state law procedures to preserve that evidence for appellate review"); *see also id.* (stating that

*Strickland* requires us to assess counsel's performance with "a *strong presumption* that counsel's conduct falls within the wide range of reasonable professional assistance." 466 U.S at 689 (emphasis added). Under the circumstance we've described, we can't say Bilotti's trial counsel's failure to lodge a religion-based *Batson*-type challenge here fell below "an objective standard of reasonableness," under "prevailing professional norms," such that counsel failed to function adequately under the Sixth Amendment. *See id.* at 687–88.

Plus, although we have found deficiency in the past when counsel failed to raise a *race-based Batson* challenge during voir dire, *see, e.g., Davis*, 341 F.3d at 1314; *Jackson v. Herring*, 42 F.3d 1350, 1360 (11th Cir. 1995), we've never found deficiency for the failure to raise a *religion-based* challenge. That's so because, as we've noted, under Florida law, courts address these questions on a case-by-case basis. *See Alen*, 616 So. 2d at 454. And under the state of the law at the time of Bilotti's trial, no Florida court had extended *Batson* to religion-based claims as a categorical matter.

So Bilotti's voir dire claim fails. In sum, even if she can show prejudice, she's failed to establish deficiency under *Strickland*.

----

counsel's mistaken beliefs of law or "ignorance of a point of law that is fundamental to his case" can constitute deficient performance).

C. *The state court reasonably concluded that Bilotti failed to show the jury instructions were erroneous.*

Bilotti's jury-instructions claim also fails. The problem is that she can't establish the jury instructions were likely erroneous. As a result, Bilotti can show neither deficiency nor prejudice.

Bilotti argues that *Hedgeman* and another sufficiency-of-the-evidence case suggest the state had to prove that Bilotti intended to kill Rojas, or at least that she knew her father and Pacchiana intended to do so. So in Bilotti's view, the court's instruction that the state did not need to prove that "the defendants had an intent to cause [Rojas's] death" was erroneous. And because her attorney did not object to this allegedly erroneous instruction, Bilotti continues, he performed deficiently. Plus, Bilotti argues, that allegedly deficient performance prejudiced Bilotti. She asserts that an email from a juror shows that the jury misunderstood the mens rea element when it convicted her of second-degree murder on the principal theory.

This argument fails. Whether the jury instructions were correct is a matter of state law. *Jones v. Kemp*, 794 F.2d 1536, 1540 (11th Cir. 1986) (per curiam). That means we must defer to the state courts' construction of that law. *See Pinkney v. Sec'y, DOC*, 876 F.3d 1290, 1295 (11th Cir. 2017); *see also Agan v. Vaughn*, 119 F.3d 1538, 1549 (11th Cir. 1997).

Here, the jury charge on second-degree murder and the principals instruction were substantively identical to Florida's

standard jury instructions at the time of Bilotti's trial in 2015.[7]  *See In re Standard Jury Instructions In Crim. Cases*, 137 So. 3d 995, 1011 (Fla. 2014) (per curiam) (the second-degree murder charge); *Standard Jury Instructions in Crim. Cases (95-2)*, 665 So. 2d 212, 214 (Fla. 1995) (per curiam) (the principals instruction).  And the Supreme Court of Florida had not invalidated the standard jury instructions that the court used in her case.

The Supreme Court of Florida has repeatedly said that "trial counsel's failure to object to standard jury instructions that have not been invalidated by this Court does not render counsel's performance deficient." *Thompson v. State*, 759 So. 2d 650, 665 (Fla. 2000) (per curiam); *accord Lukehart v. State*, 70 So. 3d 503, 520 (Fla. 2011) (per curiam).  So the state court reasonably concluded that the jury instructions were not erroneous, denying Bilotti's *Strickland* claim in turn.  In other words, counsel's failure to object to the use of these standard jury instructions was not deficient performance.  *See Thompson*, 759 So. 2d at 665; *Lukehart*, 70 So. 3d at 520.  Nor was it prejudicial, given that the state court reasonably concluded the jury instructions weren't erroneous to begin with.  *See, e.g.*, *Pinkney*, 876 F.3d at 1297; *United States v. Winfield*, 960 F.2d 970,

---

[7] We look to the standard jury instructions in place at the time of Bilotti's trial because *Strickland* requires us to assess counsel's performance *at the time*, and not in hindsight.  *See* 466 U.S. at 689.  And the only differences between the court's instructions and Florida's standard jury instructions were the trial court's use of an "a" instead of a "the" in one place, and a plural "defendants" instead of the singular "defendant" in another.  But Bilotti doesn't challenge these minute differences.

974 (11th Cir. 1992) (per curiam) ("[A] lawyer's failure to preserve a meritless issue plainly cannot prejudice a client.").

We don't find Bilotti's arguments to the contrary convincing. Neither *Hedgeman* nor the other case Bilotti relies on—*Cornejo v. State*, 892 So. 2d 1160 (Fla. Dist. Ct. App. 2005)—requires the conclusion that the jury instructions here were likely erroneous. And as intermediate appellate decisions, they couldn't have made counsel's decision not to challenge Florida's standard jury instructions one that no reasonably competent attorney would have made. *See Lukehart*, 70 So. 3d at 520.

On a more specific level, the magistrate judge thoughtfully explained why *Hedgeman* and *Cornejo* cannot provide Bilotti relief. In short, it's because their statements of the elements required to prove second-degree murder on a principal theory are not necessarily inconsistent with the court's instruction that the state didn't have to prove that "the defendants had an intent to cause death." Then-Judge Pariente explained this in her dissenting opinion in *Jamerson*, 677 So. 2d at 1301 (Pariente, J., dissenting), and the Florida appellate court in *Wright v. State*, 402 So. 2d 493, 499 (Fla. Dist. Ct. App. 1981), had reached the same conclusion. As then-Judge Pariente explained, "second-degree murder is a general intent crime," so the state must prove only that the defendant intended for a "depraved-mind act" to be committed. *See Jamerson*, 677 So. 2d at 1301 (Pariente, J., dissenting); *accord Wright*, 402 So. 2d at 499 ("[E]vidence that the aider and abettor knew that the principal had a premeditated design to kill *or* a depraved mind, will support the

aider and abettor's conviction for . . . second degree murder." (emphasis added)).  In other words, *Wright* and the *Jamerson* dissent suggest that Bilotti did not need to have intended for Rojas to be killed, nor did she need to have known of her father's or Pacchiana's specific intentions to kill Rojas; she needed only to have intended for a "depraved-mind act" to occur.

Of course, Bilotti correctly observes that dissents are not binding precedent.  But then-Judge Pariente's reasoning explains how a reasonably competent attorney could have concluded that the Florida standard jury instructions and *Hedgeman* could peacefully coexist.  And in any case, as we've explained, Florida law requires that the *Supreme Court of Florida*—not an intermediate appellate court—have invalidated standard jury instructions for a *Strickland* claim like this to prevail.  *See Thompson*, 759 So. 2d at 665; *Lukehart*, 70 So. 3d at 520.

Last, Bilotti argues that even if the jury instructions from her case matched the standard ones, her counsel still was ineffective for failing to object to "inapplicable standard jury instructions."  But Bilotti doesn't explain how the jury instructions here were "inapplicable."  And given that the state sought to convict her of second-degree murder on the principal theory as a lesser-included offense of the charged offense (first-degree murder), it's not self-evident to us how they could be "inapplicable."  Indeed, in response to the state's noted confusion about this argument in its responsive brief, Bilotti offered no reply.

So Bilotti's jury-instructions claim fails.

## III.    CONCLUSION

For the reasons we've described, we affirm the district court's judgment.

**AFFIRMED.**